[No. B225796. Second Dist., Div. Five. Sept. 9, 2011.]

DEANE EARL ROSS, as Cotrustee, etc., et al., Plaintiffs and Appellants, v. CALIFORNIA COASTAL COMMISSION et al., Defendants and Appellants;
MALIBU BAY COMPANY, Real Party in Interest and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part III.E. to H.

902

906

COUNSEL

Elkins Kalt Weintraub Reuben Gartside and John M. Bowman for Plaintiffs and Appellants.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, John A. Saurenman, Assistant Attorney General, Christina Bull Arndt and Wyatt E. Sloan-Tribe, Deputy Attorneys General, for Defendant and Appellant California Coastal Commission.

Christi Hogin, City Attorney; Jenkins & Hogin and John C. Cotti for Defendant and Appellant City of Malibu.

Alston & Bird, Nicki Carlsen and Rebecca S. Harrington for Real Party in Interest and Appellant.

OPINION

TURNER, P. J.—

## I. INTRODUCTION

A governmental entity with beachfront property within its borders must adopt a local coastal program. A local coastal program or any amendments thereto are subject to approval by the California Coastal Commission (the commission). Public Resources Code section 21080.5, subdivision (a), which is part of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.), permits the Secretary of the Resources Agency (the secretary) to certify an administrative agency's regulatory program. The secretary's certification extends to the preparation of written documentation supporting an environmental decision. Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), and California Code of Regulations, title 14, section 15252, subdivision (a) of the Guidelines for Implementation of the California Environmental Quality Act (Guidelines) specify certain procedural substantive requirements for a certified program's environmental documentation with reference to a local coastal program as well as other planning decisions. Once the secretary certifies a local coastal program, written documentation supporting the commission's approval may be used in lieu of an environmental impact report. The secretary has certified the commission's review process for approving a local coastal program amendment.

The only undeveloped beachfront property (the subject property) in the City of Malibu (the city) on Broad Beach is owned by Malibu Bay Company

(the developer). In order to facilitate the subdivision of the subject property, the city, among other things, adopted an amendment to its local coastal program. The commission, relying on a written staff report and testimony, certified the amendment to the city's local coastal program, albeit only after increasing the view corridors from Pacific Coast Highway to the beach. No environmental impact report was prepared.

In response, plaintiffs, Deane Earl Ross and the Ross Family Trust, filed a mandate petition challenging the commission's certification, with the afore-mentioned view corridor modification, of the city's local coastal program amendment. The trial court granted plaintiffs' mandate petition, in part, finding noncompliance with the procedural and substantive requirements imposed for environmental impact reports by the California Environmental Quality Act. The commission, the city and the developer appeal from that portion of the judgment partially granting plaintiffs' mandate petition. As to that portion of the judgment denying their mandate petition, plaintiffs have appealed.

In the published portion of this opinion, we conclude the commission reasonably resolved conflicting city development standards concerning buffers in environmentally sensitive habitat areas. Further, largely applying Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), and Guidelines section 15252, we resolve questions about the adequacy of the commission's review, approval and modification of the amendment to the city's local coastal program. We conclude the commission complied with Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), and Guidelines section 15252, subdivision (a). Thus, the mandate petition should have been denied in its entirety.

## II. BACKGROUND

### A. The Subject Property

The administrative record reveals that the developer owns a 2.08-acre beachfront parcel in the city, located at the eastern end of Broad Beach between Pacific Coast Highway and the ocean. The subject property is approximately 200 feet wide at its northern boundary along Pacific Coast Highway and narrows to approximately 186 feet at its southern border along the beach. The property is the last undeveloped parcel on Broad Beach in a developed residential area. There are beachfront residences on both sides of Broad Beach Road. The subject property is undeveloped except for a narrow access driveway, landscaping, and gated fencing at the northern end of the property. The subject property is zoned for single-family medium density (one unit per 0.25 acre) in the city's local coastal program. The "Local

Implementation Plan," part of the city's local coastal program, required that all new lots in the single-family medium-density zoning district have a minimum size of 0.25 acre and a minimum lot width of 80 feet. (We will discuss later the roles of a local implementation plan and local coastal program as part of the planning process under the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.; Coastal Act).)

The subject property is part of a larger coastal dune ecosystem at Broad Beach. The coastal dune community fronting homes along Broad Beach is part of the southern foredunes, which are considered environmentally sensitive habitat areas in the city's local coastal program. (We will later clarify the concept of an environmentally sensitive habitat area.) Dunes range from lightly to heavily impacted with nonnative plants between the beach and most of the homes. The subject property has been disturbed over time: beginning with the construction of Pacific Coast Highway; its use as a boat storage and launching site; and then its use as a construction staging ground.

## B. The City Proceedings

On July 29, 2005, the developer applied for issuance of a coastal development permit, tentative parcel map, general plan amendment, and zoning text amendment. The developer sought to subdivide the 2.08-acre, 200-foot-wide beachfront property into four separate lots. Each proposed lot was more than 0.50 acre with a lot width ranging from 48 to 50 feet. The four proposed lots did not meet the local coastal program's minimum lot width requirement of 80 feet for the single-family medium-density zoning district. The developer also requested the Local Implementation Plan portion of the local coastal program be amended so as to create a new zoning district allowing for a lot width of 45 feet.

The city staff reviewed the developer's application and prepared a draft mitigated negative declaration to satisfy California Environmental Quality Act requirements. On June 8, 2006, the city published a notice of intent to adopt the draft mitigated negative declaration for the project. Plaintiffs, who own a parcel next to the subject property, and other residents objected to the project and the draft mitigated negative declaration. Plaintiffs argued that the proposed amendment to the local coastal program would constitute illegal "spot" zoning. They also argued that the project violated the local coastal program and land use plan regulations relating to the protection of environmentally sensitive habitat areas.

On September 5, 2006, the city planning commission conditionally approved a coastal development permit, proposed tentative parcel map and draft mitigated negative declaration. The planning commission recommended the

city council approve the local coastal program, zoning text and map, and general plan map amendments. Plaintiffs appealed the city planning commission's decision to the city council arguing in part that the amendment constituted illegal "spot" zoning. In response, the city staff developed an alternative proposal to amend the Local Implementation Plan portion of the local coastal program to reduce the minimum lot width standard from 80 feet to 45 feet for *all* of the 733 beachfront parcels. The lots were all within the city's single-family medium-density zoning district.

The city staff analyzed the single-family medium-density zoned beachfront properties to determine if the new lot width standard would allow for an increase in development density. The city staff found of the 733 single-family medium-density zoned beachfront parcels within its boundaries, the majority were nonconforming, with an average lot width of 50 feet. At Broad Beach, the average lot width was only 48 feet.

The city staff found only five parcels meeting both the lot size and width minimum requirement which could be subdivided under the new proposed lot width standard; one of which was the subject property. The other four parcels were already developed with single-family homes. Two of the four developed parcels were created by lot mergers or "ties" of three and four lots and could not be further subdivided under the local coastal program. The city staff determined only two developed parcels could potentially use the draft local coastal program amendment to create an additional lot each, if demolition of the existing homes and subdivision were requested. To subdivide, the owners of these two developed parcels would be required to apply for a coastal development permit and the city would need to conduct environmental review under the California Environmental Quality Act on those lots. The city staff determined the draft local coastal program amendment would have negligible direct and cumulative impacts on aesthetics, biological resources and land use and planning.

As part of the draft mitigated negative declaration, the city staff evaluated potential impacts to environmentally sensitive habitat areas. Dune environmentally sensitive habitat areas are not designated on the land use plan environmentally sensitive habitat areas overlay map. Thus, the city staff is required to conduct a site-specific biological study to determine the extent of dune environmentally sensitive habitat areas and their buffers on the property pursuant to Local Implementation Plan sections 4.3.A and 4.6.1.G. The developer submitted a dune environmentally sensitive habitat areas restoration plan for the subject property by its biologist, Edith Read. The restoration plan would restore the dune features to within 20 feet of the stringline. The plan recommended a 10-foot seaward buffer from the stringline. The restoration plan specified removal of nonnative plants; planting of native dune

plants; monitoring; and the designation of one dune access path for each of the proposed four newly created parcels.

In response to plaintiffs' contention the least damaging alternative would be to allow the site to be developed under existing zoning regulations that would allow for two (rather than four) buildable lots, the city staff conducted an alternatives analysis. The city staff compared view corridors and development footprints for one, two, three and four lots on the subject property. The city staff concluded that four lots resulted in the greatest viewing area, the smallest development footprint and the least environmentally damaging option.

On December 8, 2006, plaintiffs submitted additional comments and documents to the city including a report prepared by Rincon Consultants on the biological constraints to development of the subject property. The Rincon Consultants report found the property contained environmentally sensitive habitat areas. The Rincon Consultants report concluded development could adversely affect habitat for certain rare, threatened and endangered species, including the western snowy plover, a bird, and the globose dune beetle.

On January 22, 2007, the city council adopted an ordinance approving the local coastal program amendment conditioned on the commission's certification. The city council also adopted a resolution denying plaintiffs' appeal; adopted a revised mitigated negative declaration; and conditionally approved the tentative parcel map and the coastal development permit for the subject property. On March 6, 2007, the city submitted the proposed local coastal program amendment and related documents to the commission for certification of the local coastal program amendment.

## C. The Commission Proceedings

### 1. The commission staff report

On May 29, 2008, the commission staff issued a report. The report recommended the commission approve the city's proposed local coastal program amendment with suggested modifications. The report also recommended that the commission adopt a modified version of the local coastal program amendment which would add a new "Malibu Bay Company Overlay District" to the Local Implementation Plan. The new overlay district would include conditions for view corridors, dune restoration, rear setback and an open space conservation easement.

The commission staff report discussed the city staff's review of the 733 single-family medium-density zoned beachfront lots. The commission staff

noted besides the subject property, only two other lots could feasibly be subdivided to create one additional parcel each, if demolition of the existing homes and subdivision were requested. The commission staff report stated that subdivision of the subject property as a result of the local coastal program amendment would not create additional lots significantly smaller than the average size of surrounding parcels. The commission staff report concluded reducing the minimum lot width standard in the single-family medium-density beachfront zone to facilitate a future residential subdivision on the subject property would not conflict with Public Resources Code section 30250, subdivision (a)[1] as incorporated into the city's land use plan with the following qualification. That qualification is that the anticipated future development would comply with Public Resources Code section 30250, subdivision (a) so long as it did not have significant individual or cumulative adverse impacts on coastal resources.

The staff report analyzed the impact of the proposed development on the ocean views from the public roadways. The commission staff report noted, "[The local coastal program] view corridor provision requires that buildings occupy a maximum of 80 percent of a site's lineal frontage, while the remaining 20 percent of the lineal frontage is maintained as a contiguous view corridor, except on lots 50 feet or less in width, in which case the view corridor may be split into two 10 percent view corridors on either side of the residence." Thus, reducing the minimum lot width standard proposed in the city's local coastal program amendment would increase the number of smaller sized parcels which in turn would create smaller view corridors. The commission staff report proposed that "[n]o less than 20 percent of the linear frontage of each created parcel of the subdivision" be maintained as one contiguous public view corridor. In addition, the commission staff report proposed mitigation measures including removal of fencing that is not visually permeable; vegetation over two feet in height; and existing obstructions between Pacific Coast Highway and the onsite access road.

The commission staff report also analyzed impacts to biological resources on the subject property, including dune environmentally sensitive habitat areas. The commission staff report reviewed various biological reports of the onsite dune community submitted by the developer's consultants, surveys of

---

[1] Public Resources Code section 30250, subdivision (a), which is part of the Coastal Act, states: "New residential, commercial, or industrial development, except as otherwise provided in this division, shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have significant adverse effects, either individually or cumulatively, on coastal resources. In addition, land divisions, other than leases for agricultural uses, outside existing developed areas shall be permitted only where 50 percent of the usable parcels in the area have been developed and the created parcels would be no smaller than the average size of surrounding parcels."

special status species on the subject property and a May 15, 2008 memorandum from the commission staff biologist, Dr. Jonna Engel. Dr. Engel disagreed with the developer's two consultants who both stated that a portion of the dunes on the subject property, referred to as the primrose/lupine area, was previously disturbed and should not be considered as an environmentally sensitive habitat area. (Primrose and lupine are wildflower species.) Dr. Engel concluded the primrose/lupine area should be included as a dune environmentally sensitive habitat area. She explained dune hummocks and mounds dominated by native vegetation continue to persist in the area despite the intensive disturbance history of the site. Dr. Engel believed the primrose/lupine area should be considered an environmentally sensitive habitat area under the Coastal Act given the rarity of dune habitats across the state and the ease with which they are degraded by human activity. Based on the reports of the developer's consultants and Dr. Engel's memorandum, the commission staff report concluded the southern foredune community, including the lupine/primrose area on the subject property, met the Coastal Act definition of an environmentally sensitive habitat area.

The commission staff report also reviewed the biologists' opinions on the necessity of a buffer between the environmentally sensitive habitat areas and any development on the subject property. In an April 10, 2008 letter to the commission, the city's biologist, Dave Crawford, concurred with the conclusions of the dune habitat assessment by one of the developer's biologists. Mr. Crawford stated that he and the city's environmental review board have established a standard buffer policy for dune habitat on beachfront property. The standard buffer policy requires development go no further seaward than the stringline in conjunction with a dune restoration plan. This was because the remnant dunes in Malibu are highly disturbed and have limited function and value. This policy has been in effect for numerous projects along Broad Beach Road. According to Mr. Crawford, "The majority of the dunes remaining in Malibu support predominately non-native and invasive ice plant, that not only out-competes (and often eliminates) the native dune vegetation, but over-stabilizes the dunes, thus resulting in an unnatural condition that prevents the natural 'movement' of the dunes and reduces their value as native habitat." By allowing development consistent with the stringline standard, Mr. Crawford explained the city can require projects to incorporate dune restoration plans that over time will improve the remnant dune biological functions and values.

Dr. Engel disagreed with the opinion of the developer's consultants and Mr. Crawford that no buffer was necessary inland from the stringline. She noted: "Generally, the [c]ommission protects environmentally sensitive habitat, such as southern foredunes, with buffers or set-backs. Set-backs are necessary to insure that development will not significantly degrade the [environmentally sensitive habitat areas]." Dr. Engel recommended a 25-foot

minimum buffer between the dune environmentally sensitive habitat areas and development. She stated, "This distance is consistent with other [c]ommission dune buffer determinations and with the United States Department of the Interior, Fish and Wildlife Service's recommendation for this site documented in their April 18, 2007 letter as well as in person . . . ." (Fn. omitted.) In the same letter, the United States Department of the Interior, Fish and Wildlife Service staff concurred with the developer that development on the subject property "would not result in the take of the federally threatened" western snowy plover.

The commission staff report rejected the no buffer recommendation made by the city's biologist, Mr. Crawford, and the developer's consultants. But, the commission staff report also did not accept Dr. Engel's 25-foot buffer recommendation. The commission staff report found that a five-foot buffer from designated environmentally sensitive habitat areas "would be both equitable and protective of the biological integrity of the on site dune [environmentally sensitive habitat areas]" especially after implementation of the dune restoration plan. The commission staff report explained: "Given the proximity of dune [environmentally sensitive habitat areas] on the property and assuming a [25-foot] buffer is applied, it is possible to site future development for four separate parcels without building in [environmentally sensitive habitat areas] or [the environmentally sensitive habitat areas] buffer. This is consistent with the land division and [environmentally sensitive habitat area] policies of the Malibu [land use plan]. However, because dune [environmentally sensitive habitat areas are] situated essentially up to the 'stringline' across about three quarters of the property, a [25-foot] buffer would significantly reduce the amount of buildable area for most of the newly created parcels. The [c]ommission recognizes that the subdivision will accommodate infill development and it is important to consider what would be both equitable and most protective of coastal resources. If [environmentally sensitive habitat areas] and a [25-foot environmentally sensitive habitat areas] buffer were strictly delineated for siting future development of newly created parcels, the result would be much smaller available development area than is allowed by the existing development pattern along this densely developed stretch of Broad Beach. However, providing no buffer in exchange for restoration (as was determined sufficient by the [c]ity and the applicant's biological consultants) is inconsistent with [land use plan] section 3.23, which requires buffer areas around [environmentally sensitive habitat areas] to serve as transitional habitat and provide distance and physical barriers to human intrusion in order to preserve the biological integrity of the [environmentally sensitive habitat areas]."

The commission staff report also analyzed view corridor and development alternatives with 50-, 100- and 200-foot lot widths. The commission staff report stated: "Future subdivision of the subject property as a result of the

[local coastal program amendment] request will result in four approximately [50-foot-]wide parcels with only a [five-foot] view corridor on either side of each parcel. Compared to two [100-foot-]wide lots with [20-foot] view corridors each, or one [200-foot-]wide lot with a [40-foot] view corridor that is currently allowed under the [local coastal program], reducing the minimum lot width standard to accommodate the subdivision will adversely impact views of the beach and ocean from Pacific Coast Highway." The developer proposed, and the commission staff report accepted, a contiguous 20 percent (10-foot-wide) view corridor on each side of the four newly created parcels. Each view corridor would be contiguous with one other view corridor. This would result in two 20-foot-wide view corridors across the entire 200-foot-wide property. This arrangement would replace several 10-foot-wide corridors. The commission staff report found the developer's proposal would provide maximum protection of visual resources while still accommodating subdivision of the subject property.

### 2. The 13-day public notice and comment

On May 29, 2008, the commission issued a public notice of a June 11, 2008 public hearing in Santa Rosa to all relevant parties. The public notice stated that commission staff recommended the approval of the city's local coastal program amendment with modifications. The staff report and notice were posted on the commission's Web site the same day. Plaintiffs obtained a copy of the staff report from the commission's Web site on May 30, 2008. On June 6, 2008, plaintiffs submitted written comments on the local coastal program amendment.

### 3. The commission staff report addendum

On June 9, 2008, the commission staff issued an addendum to the May 29, 2008 staff report. The addendum made minor changes to the prior commission staff report and responded to public comments including those of plaintiffs. The addendum noted, "The proposed [45-foot] width will result in lots that are substantially similar to the existing pattern of development along Broad Beach." Although the 45-foot width standard would apply to all beachfront parcels zoned single-family medium density, the subject property was the only vacant site that would be affected by the proposed modification of the lot width standard. Two other properties could be affected by the new 45-foot width standard only if the existing development were to be demolished. The June 9, 2008 addendum further stated, "The overlay district for [the subject property] reflects the landowner's agreement to incorporate more strict development standards regarding view corridors, habitat restoration and open space easements than required by the Malibu [local coastal program]." The addendum responded to comments relating to the environmentally

sensitive habitat areas and the potential environmental impacts of the project. The addendum stated that the review of the environmentally sensitive habitat areas had been conducted to a level of specificity that would normally be carried out at a coastal development permit juncture, rather than a local coastal program approval stage.

The addendum also addressed comments regarding view resources by recommending the revision of the city's Local Implementation Plan section 6.5. The commission staff recommended amending the city's Local Implementation Plan section 6.5, which is labeled, "Development Standards" to include a new provision mandating broader view corridors. The proposed Local Implementation Plan section 6.5.E.6 provides: "New subdivisions of beachfront residential parcels, where structures cannot be sited or designed below road grade, shall ensure no less than 20% of the lineal frontage of each newly created parcel shall be maintained as one contiguous public view corridor (even if the resultant lots are 50 feet or less in width). The view corridors of the newly created parcels shall be contiguous to the maximum extent feasible in order to minimize impacts to public views of the ocean. This requirement shall be a condition of permit approval for the subdivision of a beachfront property." This proposed revision guaranteed 20 percent of the lineal frontage of each newly created parcel would be maintained as one contiguous public view corridor even if the resultant lots were 50 feet or less in width.

The addendum also attached written disclosures of ex parte communications received by certain members of the commission; a June 9, 2008 report from one of the developer's consultants entitled "Second Botanical Evaluation of Primrose/Lupine Area"; and a June 9, 2008 supplemental memorandum from Dr. Engel. In her supplemental memorandum, Dr. Engel clarified her dune landscape terminology and the definition of environmentally sensitive habitat areas in the Coastal Act. She also explained her reasons for including the primrose/lupine area as a component of overall dune environmentally sensitive habitat areas. Dr. Engel again recommended a 25-foot buffer be imposed. Dr. Engel agreed that the developer had proposed to restore the disturbed southern foredune environmentally sensitive habitat areas and had incorporated a number of best management practices into its design. She agreed these measures would help maintain the ecological functions of the southern foredune community. But Dr. Engel concluded these measures did not vitiate the need to set back development from the very edge of the environmentally sensitive habitat areas.

### 4. The commission hearing and decision

At the June 11, 2008 meeting, the commission considered the city's proposed local coastal program amendment. The commission heard testimony

concerning the city's local coastal program amendment from several speakers including: representatives for plaintiffs; the city; the developer; and the commission staff including Executive Director Peter Douglas and Dr. Engel. Dr. Engel again recommended a 25-foot buffer for environmentally sensitive habitat areas.

During the commission's deliberations, Commissioner Ben Hueso expressed concern that the local coastal program amendment might cause a change in residential density that had not been subject to environmental review. Mr. Douglas replied that there were only two other properties that might be affected; thus, the commission staff did not think the local coastal program amendment would increase density, either individually or cumulatively within the city. As to the buffer for environmentally sensitive habitat areas, Commissioner Mary Shallenberger questioned what fair and equitable meant in the context of the Coastal Act. Commissioner Shallenberger stated that in the future when there is a single lot left in any local government jurisdiction, the commission might not be able to utilize the best science as recommended by its biologist. Instead, she indicated the commission may have to compromise and impose conditions consistent with existing permits. In response, Mr. Douglas stated that the issue of fairness and equity is always considered by the commission and is applied from time to time where other properties or areas are similarly situated. Mr. Douglas explained the commission staff's rationale: "[I]n this case, when you look at the other approvals in the City of Malibu, that there were no buffer setbacks required before, we didn't [appeal] those approvals in the past, and therefore this is a case of first impression. So, we felt that treating this party, in as much similarly to others situated in the same way made sense, but the additional factor was that the restoration that we are getting here was of such importance that we felt both the equity issues, in terms of how others had been treated—and this is the first time that we are requiring this kind of a buffer—and the restoration component warranted the requirement of a 5-foot buffer to avoid a direct impact on the [environmentally sensitive habitat areas]."

At the conclusion of the June 11, 2008 hearing, the commission adopted the staff report. The commission conditionally certified the local coastal program amendment with the staff's recommended modifications. On November 10, 2008, the city approved an ordinance adopting the local coastal program amendment with the commission's proposed modifications. On January 7, 2009, the local coastal program amendment became effective when the commission concurred with Mr. Douglas's determination that the city had accepted the modifications proposed on June 11, 2008.

### D. The Trial Court Proceedings

#### 1. The mandate petition

On February 6, 2009, plaintiffs filed a verified mandate petition challenging the commission's approval of the local coastal program amendment asserting claims based on noncompliance with the Coastal Act and the California Environmental Quality Act. Plaintiffs alleged three causes of action: the commission violated numerous land use plan policies of the city; the commission's certification of the local coastal program amendment violated the California Environmental Quality Act; and the city's adoption of the local coastal program amendment was contrary to the land use plan and constituted impermissible "spot" zoning.

#### 2. The trial court's rulings

#### a. Coastal Act issues

On February 2, 2010, the trial court issued a decision granting the mandate petition in part. As to plaintiffs' challenge of the appropriate buffer for environmentally sensitive habitat areas, the trial court found the commission could use common sense and principles of equity to consider the appropriate buffer provided its conclusion was supported by scientific evidence. The trial court found Mr. Crawford's no buffer conclusion supported the commission's imposition of a five-foot buffer if the city had consulted with the Department of Fish and Game as required under Local Implementation Plan section 4.6.1.G. Because there was no evidence that the Department of Fish and Game was consulted, the commission staff report did not constitute substantial evidence to support the five-foot buffer requirement. As will be noted, the trial court, in response to the developer's new trial motion, reversed the finding that there was insufficient "consultation" with the Department of Fish and Game.

The trial court rejected plaintiffs' argument that the local coastal program amendment violated the city's "Land Use Plan Policy" No. 5.35 because the 45-foot width of the proposed lots was less than the 50-foot average parcel width of the city's 733 single-family medium-density zoned beachfront lots and the 48-foot average of Broad Beach properties. The city's Land Use Plan Policy No. 5.35 requires, "The minimum lot size in all land use designations shall not allow land divisions, except mergers and lot line adjustments, where the created parcels would be smaller than the average size of surrounding parcels." The trial court found the local coastal program amendment would result in four lots, each greater than 0.50 acre on the subject property, while the parcels on each side of the property were 0.25 and

0.38 acres. Thus, according to the trial court, the proposed lots were consistent with the city's Land Use Plan Policy No. 5.35.

The trial court also rejected plaintiffs' contention that the local coastal program amendment violated the city's Land Use Plan Policy No. 6.18's requirement of "one contiguous view corridor" of at least 40 feet (20 percent of the property's lineal frontage). The trial court found the city's Land Use Plan Policy No. 6.18 requires that 20 percent of the lineal frontage for a particular lot be available for a contiguous view corridor, not 20 percent of the undivided parcel. Thus, once the property is divided into four lots, the developer could have provided for three 10-foot corridors between four houses with 2 five-foot perimeter corridors and still have complied with the city's Land Use Plan Policy No. 6.18. The trial court ruled substantial evidence supported the commission's conclusion that two 20-foot view corridors met the requirements of Land Use Plan Policies Nos. 6.5 and 6.18.

### b. California Environmental Quality Act issues

The trial court ruled the commission failed to comply with various provisions of the California Environmental Quality Act. The commission argued it was a responsible, and not the lead, agency under the California Environmental Quality Act. The trial court rejected this contention. The trial court ruled the commission was the lead agency. The trial court found that under Public Resources Code section 30514, the commission must certify the proposed local coastal program amendment. Absent commission certification, the local coastal program amendment could not take effect. And according to the trial court, the commission does not share approval authority with the city. Hence, in the trial court's view, the commission is a lead, not a responsible, agency.

The trial court found the city and the commission were required to, but did not, consider the cumulative impacts of the local coastal program amendment. The trial court agreed the commission was not required to conduct cumulative impact analysis for two developed lots that were previously tied. This was because it was unlikely that the two parcels would be untied and subdivided in the future given the local coastal program policies that restricted potential development of these tied lots. However, the trial court ruled the city and the commission should have performed an environmental impact analysis on the two developed lots that could be feasibly subdivided in the future. The trial court ruled, "It may be that the [c]ity biologist would apply the same [environmentally sensitive habitat areas] analysis to these two lots—that no dune [environmentally sensitive habitat areas] protection is required beyond the stringline—the court cannot assume that to be true. [Dr.] Engel also may have a different opinion. Moreover, the report fails as an

informational document with respect to that issue." The trial court also found the commission failed to adequately respond to comments concerning the cumulative impacts of the local coastal program amendment on the two affected lots.

Further, the trial court ruled the commission staff report failed as an informational document due to inadequate analysis of the alternatives of a wider view corridor and fewer lots in the subdivision of the subject property. The trial court noted the city considered alternatives by comparing view corridors and development envelopes for one, two, three and four lots on the subject property and concluded, "[F]our lots resulted in the smallest development footprint and greatest viewing area and was the least environmentally damaging alternative." But the commission staff report did not expressly state it relied on the city's alternatives analysis. The trial court also found: "[T]here is no analysis of the view corridors for the other two lots affected by the [local coastal program] amendment, and whether different development envelopes would mitigate view impacts from those lots. The [c]ommission did impose [Local Implementation Plan] [s]ection 6.5(E), which would prevent a reduction in view corridor for those two lots, but provides no analysis of the view corridors and development envelopes [for] those two lots."

The trial court also agreed with plaintiffs' argument that the commission did not provide adequate notice and time for public review of the staff report. The commission argued it complied with its regulations by mailing notice of the meeting and posting the staff report on May 29, 2008, 13 days prior to the June 11, 2008 hearing. The 13-day notice of the hearing and circulation of the staff report by the commission exceeded the regulations' requirement of a minimum of seven days for the report and 10 days for the hearing notice. But, the trial court ruled the commission's regulations failed to comply with the 30-day public review period required under Public Resources Code section 21091, subdivision (a). The trial court also found that the 13-day review period was unreasonable because the issues concerned a zoning amendment that affected more than the subject property, they were biological in nature, and the commission released the staff report addendum just two days before the hearing. The trial court further held plaintiffs did not have to show prejudice: "Although lack of adequate notice usually requires prejudice in other contexts, and there is no evidence that [plaintiffs] or any other member of the public was prejudiced by the actual notice and period for comment on the staff report, full compliance with the letter of [the California Environmental Quality Act] is essential to its public purpose and a failure to provide the full [30-day] period by itself warrants setting aside the [commission's] decision."

On February 16, 2010, the developer filed a new trial motion. On April 5, 2010, the trial court granted the new trial motion with respect to the Department of Fish and Game consultation issue. The trial court found consultation, within the meaning of Local Implementation Plan section 4.6.1.G, had occurred. But the trial court otherwise denied the developer's new trial motion.

## III. DISCUSSION

### A. Standards of Review

An "aggrieved person," which includes anyone who appears at a public hearing of the commission in connection with the decision or action appealed, may file a mandate petition seeking judicial review under Code of Civil Procedure section 1094.5. (Pub. Resources Code, § 30801; see *La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 814 [124 Cal.Rptr.2d 618].) The trial court's responsibilities are as follows: "In reviewing an agency's decision under Code of Civil Procedure section 1094.5, the trial court determines whether (1) the agency proceeded without, or in excess of, jurisdiction; (2) there was a fair hearing; and (3) the agency abused its discretion." (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921 [87 Cal.Rptr.3d 365]; see *La Costa Beach Homeowners' Assn. v. California Coastal Com., supra,* 101 Cal.App.4th at p. 814; Code Civ. Proc., § 1094.5, subd. (b).) Code of Civil Procedure section 1094.5, subdivision (b) defines any abuse of discretion thusly, "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (See *McAllister v. California Coastal Com., supra,* 169 Cal.App.4th at p. 921; *La Costa Beach Homeowners' Assn. v. California Coastal Com., supra,* 101 Cal.App.4th at p. 814.)

The agency's findings and actions are presumed to be supported by substantial evidence. (*McAllister v. California Coastal Com., supra,* 169 Cal.App.4th at p. 921; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335–336 [25 Cal.Rptr.2d 842].) A person challenging an administrative determination bears the burden of showing the agency's findings are not supported by substantial evidence. (*Desmond,* at p. 336; *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 [22 Cal.Rptr.2d 618] ["plaintiff in a [California Environmental Quality Act] action has the burden of proving otherwise"].) When reviewing the agency's determination, the court examines the whole record and considers all relevant evidence, including that which detracts from the administrative decision. (*McAllister v. California Coastal Com., supra,*

169 Cal.App.4th at p. 921; *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 503 [83 Cal.Rptr.2d 850]; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, 422 [253 Cal.Rptr. 426, 764 P.2d 278] [court must review whole record to determine whether substantial evidence supported Cal. Environmental Quality Act decision].) The Court of Appeal has held: "Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it." (*Kirkorowicz v. California Coastal Com.* (2000) 83 Cal.App.4th 980, 986 [100 Cal.Rptr.2d 124]; accord, *Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1077–1078 [114 Cal.Rptr.2d 798].) Our scope of review is identical to that of the trial court. (*Bolsa Chica Land Trust v. Superior Court, supra*, 71 Cal.App.4th at p. 503; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212 [30 Cal.Rptr.2d 95].) We, like the trial court, examine all relevant materials in the entire administrative record to determine whether the agency's decision is supported by substantial evidence. (*Saad v. City of Berkeley, supra*, 24 Cal.App.4th at p. 1212; *Desmond v. County of Contra Costa, supra*, 21 Cal.App.4th at pp. 334–335.)

■ We apply the following standards when interpreting a statute: "When we interpret the meaning of statutes, our fundamental task is to ascertain the aim and goal of the lawmakers so as to effectuate the purpose of the statute. We begin by examining the statutory language, giving the words their usual and ordinary meaning. If we find no ambiguity, we presume that the lawmakers meant what they said, and the plain meaning of the language governs. [Citation.] If, on the other hand, the statutory language is unclear or ambiguous and permits more than one reasonable interpretation, we may consider various extrinsic aids to help us ascertain the lawmakers' intent, including legislative history, public policy, settled rules of statutory construction, and an examination of the evils to be remedied and the legislative scheme encompassing the statute in question. [Citation.] In such circumstances, we must select the construction that comports most closely with the aim and goal of the Legislature to promote rather than defeat the statute's general purpose and avoid an interpretation that would lead to absurd and unintended consequences. [Citation.]" (*McAllister v. California Coastal Com., supra*, 169 Cal.App.4th at p. 928; accord, *Gualala Festivals Committee v. California Coastal Com.* (2010) 183 Cal.App.4th 60, 67 [106 Cal.Rptr.3d 908].) Although the courts have final responsibility for interpreting a statute, an agency's interpretation of its governing statutes is entitled to great weight.

(*Gualala Festivals Committee v. California Coastal Com., supra*, 183 Cal.App.4th at p. 66; *La Fe, Inc. v. County of Los Angeles* (1999) 73 Cal.App.4th 231, 240 [86 Cal.Rptr.2d 217].)

## B. The City's Local Coastal Program

Plaintiffs challenge the trial court's ruling that the commission complied with the various Coastal Act provisions. They argue the local coastal program amendment does not conform to the policies of the certified land use plan regarding the protection of dune environmentally sensitive habitat areas and the minimum lot size requirement.

The Coastal Act was adopted in 1976 and is codified at Public Resources Code section 30000 et seq. (*Douda v. California Coastal Com.* (2008) 159 Cal.App.4th 1181, 1187 [72 Cal.Rptr.3d 98]; *McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 271 [54 Cal.Rptr.3d 116].) It has myriad purposes and goals and is a comprehensive scheme to govern coastal land use planning for the entire state. (Pub. Resources Code, § 30001.5;[2] *Yost v. Thomas* (1984) 36 Cal.3d 561, 565–566 [205 Cal.Rptr. 801, 685 P.2d 1152].) Public Resources Code section 30500, subdivision (a) requires each local government within the coastal zone to prepare a local coastal program. (*Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1011 [73 Cal.Rptr.2d 841, 953 P.2d 1188]; *North Pacifica LLC v. California Coastal Com.* (2008) 166 Cal.App.4th 1416, 1429 [83 Cal.Rptr.3d 636].)

Public Resources Code section 30108.6 identifies the components of a local coastal program: " 'Local coastal program' means a local government's (a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions, which, when taken together, meet the requirements of, and implement the provisions and policies of, this division at the local level." (See *Yost v. Thomas, supra*, 36 Cal.3d at p. 566.) The term "land use plan[]" in Public Resources Code section 30108.6 is defined in Public Resources Code section 30108.5 as follows, " 'Land use plan' means the relevant portions of a local

---

[2] Public Resources Code section 30001.5 states: "The Legislature further finds and declares that the basic goals of the state for the coastal zone are to: [¶] (a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources. [¶] (b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state. [¶] (c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners. [¶] (d) Assure priority for coastal-dependent and coastal-related development over other development on the coast. [¶] (e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone."

government's general plan, or local coastal element which are sufficiently detailed to indicate the kinds, location, and intensity of land uses, the applicable resource protection and development policies and, where necessary, a listing of implementing actions." (See *Douda v. California Coastal Com., supra,* 159 Cal.App.4th at p. 1187.) The term "implementing actions" is defined in Public Resources Code section 30108.4 as follows, " 'Implementing actions' means the ordinances, regulations, or programs which implement either the provisions of the certified local coastal program or the policies of this division . . . ." (See *Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 408, fn. 2 [71 Cal.Rptr.3d 522].) In order to be effective, any local coastal program must be reviewed, adopted and certified pursuant to the commission's regulations. (Pub. Resources Code, §§ 30501, 30333.)

The city did not implement a local coastal program after its incorporation. Thus, the Legislature enacted Public Resources Code section 30166.5[3] in 2000 and directed the commission to prepare and certify the city's local coastal program. (*City of Malibu v. California Coastal Com.* (2004) 121 Cal.App.4th 989, 992 [18 Cal.Rptr.3d 40].) The commission prepared an initial draft of the land use plan and submitted it to the city for consideration. The commission also prepared the city's Local Implementation Plan. The commission certified the city's local coastal program, including the land use and the Local Implementation Plans, on September 13, 2002. Thereafter, the city assumed responsibility for the administration of the local coastal program and for reviewing coastal development permit applications as required by Public Resources Code section 30166.5, subdivision (b).

■ A local coastal program may be amended by a local government but does not take effect until it has been certified by the commission. (Pub.

---

[3] Public Resources Code section 30166.5 provides in its entirety: "(a) On or before January 15, 2002, the commission shall submit to the City of Malibu an initial draft of the land use portion of the local coastal program for the City of Malibu portion of the coastal zone, which is specifically delineated on maps 133, 134, 135, and 136, which were placed on file with the Secretary of State on September 14, 1979. [¶] (b) On or before September 15, 2002, the commission shall, after public hearing and consultation with the City of Malibu, adopt a local coastal program for that area within the City of Malibu portion of the coastal zone that is specifically delineated on maps 133, 134, 135, and 136, which have been placed on file with the Secretary of State on March 14, 1977, and March 1, 1987. The local coastal program for the area shall, after adoption by the commission, be deemed certified, and shall, for all purposes of this division, constitute the certified local coastal program for the area. Subsequent to the certification of the local coastal program, the City of Malibu shall immediately assume coastal development permitting authority, pursuant to this division. Notwithstanding the requirements of Chapter 4.5 (commencing with Section 65920) of Division 1 of Title 7 of the Government Code, once the City of Malibu assumes coastal development permitting authority pursuant to this section, no application for a coastal development permit shall be deemed approved if the city fails to take timely action to approve or deny the application."

Resources Code, § 30514, subd. (a).) The local government submits the proposed local coastal program amendment to the commission. The commission then processes the proposed amendment using the applicable procedures and time limits specified in Public Resources Code section 30512, subdivision (a).[4] When submitting a local coastal program amendment to the commission for certification, the submission includes those matters specified in the California Code of Regulations, title 14, section 13552.[5]

---

[4] Public Resources Code section 30512, subdivision (a) states: "(a) The land use plan of a proposed local coastal program shall be submitted to the commission. The commission shall, within 90 days after the submittal, after public hearing, either certify or refuse certification, in whole or in part, of the land use plan pursuant to the following procedure: [¶] (1) No later than 60 days after a land use plan has been submitted to it, the commission shall, after public hearing and by majority vote of those members present, determine whether the land use plan, or a portion thereof applicable to an identifiable geographic area, raises no substantial issue as to conformity with the policies of Chapter 3 (commencing with Section 30200). [¶] If the commission determines that no substantial issue is raised, the land use plan, or portion thereof applicable to an identifiable area, which raises no substantial issue, shall be deemed certified as submitted. The commission shall adopt findings to support its action. [¶] (2) Where the commission determines pursuant to paragraph (1) that one or more portions of a land use plan applicable to one or more identifiable geographic areas raise no substantial issue as to conformity with the policies of Chapter 3 (commencing with Section 30200), the remainder of that land use plan applicable to other identifiable geographic areas shall be deemed to raise one or more substantial issues as to conformity with the policies of Chapter 3 (commencing with Section 30200). The commission shall identify each substantial issue for each geographic area. [¶] (3) The commission shall hold at least one public hearing on the matter or matters that have been identified as substantial issues pursuant to paragraph (2). No later than 90 days after the submittal of the land use plan, the commission shall determine whether or not to certify the land use plan, in whole or in part. If the commission fails to act within the required 90-day period, the land use plan, or portion thereof, shall be deemed certified by the commission."

[5] California Code of Regulations, title 14, section 13552 states: "The [local coastal program] . . . amendment submittal shall include: [¶] (a) A summary of the measure taken to provide the public and affected agencies and districts maximum opportunity to participate in the [local coastal program] . . . amendment process, pursuant to Section 13515 and Public Resources Code Section 30503; a listing of members of the public, organizations, and agencies appearing at any hearing or contacted for comment on the [local coastal program] . . . amendment; and copies or summaries of significant comments received and of the local government or governing authority's response to the comments. [¶] (b) All policies, plans, standards, objectives, diagrams, drawings, maps, photographs, and supplementary data, related to the amendment in sufficient detail to allow review for conformity with the requirements of the Coastal Act. Written documents should be readily reproducible. An amendment to a land use plan . . . shall include, where applicable, a readily identifiable public access component as set forth in Section 13512. [¶] (c) A discussion of the amendment's relationship to and effect on the other sections of the certified [local coastal program] . . . . [¶] (d) An analysis that meets the requirements of Section 13511 or an approved alternative pursuant to Section 13514 and that demonstrates conformity with the requirements of Chapter 6 of the Coastal Act. [¶] (e) Any environmental review documents, pursuant to [the California Environmental Quality Act], required for all or any portion of the amendment to the [local coastal program] . . . . [¶] (f) An indication of the zoning measures that will be used to carry out the amendment to the land use plan (unless submitted at the same time as the amendment to the land use plan)."

C. Environmentally Sensitive Habitat Areas

a. State and city law

■ Public Resources Code section 30240, subdivision (a) requires protection of environmentally sensitive habitat areas. Public Resources Code section 30240, subdivision (b) states, "Development in areas adjacent to environmentally sensitive habitat areas . . . shall be sited and designed to prevent impacts which would significantly degrade those areas . . . ." Consistent with Public Resources Code section 30108.6, the city's local coastal program contains various land use policies designed to protect environmentally sensitive habitat areas. The city's Land Use Plan Policy 3.1 states: "Areas in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments are Environmentally Sensitive Habitat Areas . . . and are generally shown on the [land use plan environmentally sensitive habitat areas map]. The [environmentally sensitive habitat areas] in the City of Malibu are riparian areas, streams, native woodlands, native grasslands/savannas, chaparral, coastal sage scrub, dunes, bluffs, and wetlands . . . ." The city's Land Use Plan Policy 3.16 provides: "Dune [environmentally sensitive habitat areas] shall be protected and, where feasible, enhanced. Vehicle traffic through dunes shall be prohibited. Where pedestrian access through dunes is permitted, well-defined footpaths or other means of directing use and minimizing adverse impacts shall be used. . . ." Land Use Plan Policy 3.23 requires: "Development adjacent to [environmentally sensitive habitat areas] shall minimize impacts to habitat values or sensitive species to the maximum extent feasible. Native vegetation buffer areas shall be provided around [environmentally sensitive habitat areas] to serve as transitional habitat and provide distance and physical barriers to human intrusion. Buffers shall be of a sufficient size to ensure the biological integrity and preservation of the [environmentally sensitive habitat areas] they are designed to protect. All buffers shall be a minimum of 100 feet in width . . . ." As will be noted, plaintiffs rely on this 100-foot buffer requirement in the city's Land Use Plan Policy 3.23 as part of their attack on the local coastal plan amendment.

The city's Local Implementation Plan contains specific standards for various types of environmentally sensitive habitat areas. Section 4.6.1 of the city's Local Implementation Plan[6] requires 100-foot buffers for stream/riparian,

---

[6] The city's Local Implementation Plan section 4.6.1 is labeled "Development Standards" and states in its entirety: "4.6.1. Buffers [¶] New development adjacent to the following habitats shall provide native vegetation buffer areas to serve as transitional habitat and provide distance and physical barriers to human intrusion. Buffers shall be of a sufficient size to ensure the biological integrity and preservation of the habitat they are designed to protect. Vegetation

wetlands, woodland, coastal bluff, coastal sage scrub, and chaparral environmentally sensitive habitat areas. But the city's Local Implementation Plan section 4.6.1.G provides, "For other [environmentally sensitive habitat] areas not listed above, the buffer recommended by the Environmental Review Board or City biologist, in consultation with the California Department of Fish and Game, as necessary to avoid adverse impacts to the [environmentally sensitive habitat areas] shall be required." As will be apparent, the commission, the city and the developer rely on the more flexible buffer requirement in the city's Local Implementation Plan section 4.6.1.G.

### D. Buffer for Dune Environmentally Sensitive Habitat Areas

Plaintiffs argue the five-foot buffer, as certified by the commission on November 10, 2008, fails to conform to the city's Land Use Plan Policy 3.23. Plaintiffs assert the city's Land Use Plan Policy 3.23 requirement must be imposed for all environmentally sensitive habitat areas. The commission, the city and the developer argue there is no requirement of a 100-foot buffer for dune environmentally sensitive habitat areas because of the provisions of Local Implementation Plan section 4.6.1.G. And they argue there is substantial evidence to support the five-foot buffer requirement. We agree with the commission, the city and the developer.

---

removal, vegetation thinning, or planting of non-native or invasive vegetation shall not be permitted within buffers except as provided in Section 4.6.1 (E) or (F) of the Malibu [Local Implementation Plan]. The following buffer standards shall apply: [¶] A. Stream/Riparian [¶] New development shall provide a buffer of no less than 100 feet in width from the outer edge of the canopy of riparian vegetation. Where riparian vegetation is not present, the buffer shall be measured from the outer edge of the bank of the subject stream. [¶] However, in the Point Dume area, new development shall be designed to avoid encroachment on slopes of 25 percent grade or steeper. [¶] B. Wetlands [¶] New development shall provide a buffer of no less than 100 feet in width from the upland limit of the wetland. [¶] C. Woodland [Environmentally Sensitive Habitat Area] [¶] New development shall provide a buffer of no less than 100 feet in width from the outer edge of the tree canopy for oak or other native woodland[.] [¶] D. Coastal Bluff [Environmentally Sensitive Habitat Area] [¶] New development shall provide a buffer of no less than 100 feet from the bluff edge. [¶] E. Coastal Sage Scrub [Environmentally Sensitive Habitat Area] [¶] New development shall provide a buffer of sufficient width to ensure that no required fuel modification area (Zones A, B, and C, if required) will extend into the [environmentally sensitive habitat area] and that no structures will be within 100 feet of the outer edge of the plants that comprise the coastal sage scrub plant community. [¶] F. Chaparral [Environmentally Sensitive Habitat Area] [¶] New development shall provide a buffer of sufficient width to ensure that no required fuel modification area (Zones A, B, and C, if required) will extend into the [environmentally sensitive habitat area] and that no structures will be within 100 feet of the outer edge of the plants that comprise the chaparral plant community. [¶] G. Other [Environmentally Sensitive Habitat Area] [¶] For other [environmentally sensitive habitat] areas not listed above, the buffer recommended by the Environmental Review Board or City biologist, in consultation with the California Department of Fish and Game, as necessary to avoid adverse impacts to the [environmentally sensitive habitat area] shall be required."

■ The city's Land Use Plan Policy 3.23, with its 100-foot buffer requirement, cannot be considered in isolation. Rather, as we will explain, the city's Land Use Plan Policy 3.23 must be considered in conjunction with its Local Implementation Plan section 4.6.1.G. The city's Local Implementation Plan section 4.6.1.G, which applies to dune environmentally sensitive habitat areas, as are present here, does not in all cases require a 100-foot buffer. The commission's regulations set forth the applicable method of examining implementing actions, "The standard of review of the implementing actions shall be the land use plan as certified by the Commission." (Cal. Code Regs., tit. 14, § 13542, subd. (c).) Further, Public Resources Code section 30108.6 defines a local coastal program and includes the land use plans and implementing actions, which when construed together, further the purposes of the Coastal Act at the local level. (See *Yost v. Thomas, supra,* 36 Cal.3d at p. 566.) When certifying the local implementation plan, including amendments, the commission is required to consult the land use plan. This is done to ensure conformity between the land use and the local implementation plans. (Pub. Resources Code, § 30513.)

■ The city's Land Use Plan Policy 3.23 and Local Implementation Plan section 4.6.1.G, which were simultaneously certified by the commission on September 13, 2002, should be interpreted together to give effect to all provisions of the local coastal program. (*San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831 [95 Cal.Rptr.3d 164, 209 P.3d 73] [provisions are construed in reference to each other so as to give each part effect]; *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778–779 [38 Cal.Rptr.2d 699, 889 P.2d 1019] [same].) Further, our Supreme Court has held: " 'When two statutes touch upon a common subject, they are to be construed in reference to each other, so as to "harmonize the two in such a way that no part of either becomes surplusage." [Citations.] . . .' " (*San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist., supra,* 46 Cal.4th at p. 836; see *DeVita v. County of Napa, supra,* 9 Cal.4th at pp. 778–779; *Chaffee v. San Francisco Public Library Com.* (2005) 134 Cal.App.4th 109, 114 [36 Cal.Rptr.3d 1].) Our Supreme Court has also held, "If conflicting statutes cannot be reconciled . . . more specific provisions take precedence over general ones [citation]." (*Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310 [99 Cal.Rptr.2d 792, 6 P.3d 713]; see *Strother v. California Coastal Com.* (2009) 173 Cal.App.4th 873, 879 [92 Cal.Rptr.3d 831].) In addition, our Supreme Court has held, "[I]f a specific statute is enacted covering a particular subject, the specific statute controls and takes priority over a general statute encompassing the same subject." (*Estate of Kramme* (1978) 20 Cal.3d 567, 576 [143 Cal.Rptr. 542, 573 P.2d 1369]; see *Los Angeles County Dependency Attorneys, Inc. v. Department of General Services* (2008) 161 Cal.App.4th 230, 236 [73 Cal.Rptr.3d 817].)

The 100-foot buffer specified in the city's Land Use Plan Policy 3.23 applies to all environmentally sensitive habitat areas. By contrast, the city's Local Implementation Plan section 4.6.1 requires a 100-foot buffer for stream/riparian, wetlands, woodland, coastal bluff, coastal sage scrub and chaparral environmentally sensitive habitat areas. For other than the immediately foregoing areas, the buffer is that "recommended by the Environmental Review Board or City biologist, in consultation with the California Department of Fish and Game, as necessary to avoid adverse impacts" to the environmentally sensitive habitat areas. (Local Implementation Plan, § 4.6.1.G; see fn. 6, *ante*.)

Plaintiffs argue we should apply the 100-foot buffer in the city's Land Use Plan Policy 3.23 to all environmentally sensitive habitat areas. This application, plaintiffs argue, must be made without regard to those areas specified in the city's Local Implementation Plan section 4.6.1. Such an interpretation would render the city's Local Implementation Plan section 4.6.1 superfluous and inoperable. Moreover, the city's Local Implementation Plan section 4.6.1, with its differing treatment of various environmental conditions, is more specific than the broad 100-foot requirement in the city's Land Use Plan Policy 3.23. Further, in the case of environmentally sensitive habitat areas other than stream/riparian, wetlands, woodland, coastal bluff, coastal sage scrub, and chaparral environments, Local Implementation Plan section 4.6.1.G provides a specified case-by-case method for determining the appropriate buffer.

Finally, the commission has interpreted the city's Land Use Plan Policy 3.23 in conjunction with Local Implementation Plan section 4.6.1. The commission's interpretation of the city's Land Use Plan Policy 3.23 is entitled to deference. As we have previously explained, the *commission* drafted and simultaneously certified the city's land use plan and Local Implementation Plan. As noted, we grant broad deference to the commission's interpretation of the local coastal program it prepared. (*Albertstone v. California Coastal Com.* (2008) 169 Cal.App.4th 859, 864 [86 Cal.Rptr.3d 883]; *Trancas Property Owners Assn. v. City of Malibu* (1998) 61 Cal.App.4th 1058, 1061–1062 [72 Cal.Rptr.2d 131].)

E.–H.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 900.

I. California Environmental Quality Act

1. Overview

The commission challenges the ruling that it failed to comply with specified provisions of the California Environmental Quality Act. The city and the developers join in the commission's arguments. Plaintiffs contest the trial court's ruling on one of their claims under the California Environmental Quality Act.

█ The purpose of the California Environmental Quality Act is to ensure that the agencies regulating activities "that may" affect the environmental quality give primary consideration to preventing environmental damages. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326]; see *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1372 [44 Cal.Rptr.3d 128].) Under the California Environmental Quality Act, a state agency with a regulatory program may be exempted from the requirements of preparing initial studies, negative declarations and environmental impact reports. This exemption arises if the secretary certifies that the agency's regulatory program satisfies the criteria set forth in Public Resources Code section 21080.5. (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230 [32 Cal.Rptr.2d 19, 876 P.2d 505]; *Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1067 [39 Cal.Rptr.3d 393].)

The secretary approved the commission's certified regulatory program, including the statutes and regulations relating to the preparation, approval and certification of the local coastal programs on May 22, 1979. The secretary's certification under Public Resources Code section 21080.5 included the commission's approval of local coastal program amendments. (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 552, fn. 18 [45 Cal.Rptr.2d 117].) The secretary's certification of a regulatory program can be challenged in court subject to a 30-day statute of limitations. (Pub. Resources Code, § 21080.5, subd. (h); *Laupheimer v. State of California* (1988) 200 Cal.App.3d 440, 459 [246 Cal.Rptr. 82].) Failure to do so renders the commission's certification free from subsequent collateral attack. (Pub. Resources Code, § 21080.5, subd. (h); *Elk County Water Dist. v. Department of Forestry & Fire Protection* (1997) 53 Cal.App.4th 1, 10 [61 Cal.Rptr.2d 536]; *Laupheimer v. State of California, supra,* 200 Cal.App.3d at pp. 458–459.)

As explained previously, once the secretary certifies a regulatory program, as occurred here, an administrative agency is exempted from the requirements

of preparing initial studies, negative declarations and environmental impact reports. In that case, the agency must prepare paperwork which acts as a substitute document for the normal environmental review papers, such as an environmental impact report. (Pub. Resources Code, § 21080.5, subd. (a).)[7] The requirements of a certified regulatory program which permits an agency to use a substitute document in lieu of planning documents such as an environmental impact report are specified in Public Resources Code section 21080.5, subdivision (d).[8]

 Our Supreme Court has synthesized the controlling legal principles for the circumstances where the secretary's certification permits the use of a substitute document: "The Legislature has provided that the Secretary of the Resources Agency may certify a regulatory program of a state agency as

[7] Public Resources Code section 21080.5, subdivision (a) states, "Except as provided in Section 21158.1, when the regulatory program of a state agency requires a plan or other written documentation containing environmental information and complying with paragraph (3) of subdivision (d) to be submitted in support of an activity listed in subdivision (b), the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division if the Secretary of the Resources Agency has certified the regulatory program pursuant to this section."

[8] Public Resources Code section 21080.5, subdivision (d) states: "To qualify for certification pursuant to this section, a regulatory program shall require the utilization of an interdisciplinary approach that will ensure the integrated use of the natural and social sciences in decisionmaking and that shall meet all of the following criteria: [¶] (1) The enabling legislation of the regulatory program does both of the following: [¶] (A) Includes protection of the environment among its principal purposes. [¶] (B) Contains authority for the administering agency to adopt rules and regulations for the protection of the environment, guided by standards set forth in the enabling legislation. [¶] (2) The rules and regulations adopted by the administering agency for the regulatory program do all of the following: [¶] (A) Require that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen a significant adverse effect that the activity may have on the environment. [¶] (B) Include guidelines for the orderly evaluation of proposed activities and the preparation of the plan or other written documentation in a manner consistent with the environmental protection purposes of the regulatory program. (C) [¶] Require the administering agency to consult with all public agencies that have jurisdiction, by law, with respect to the proposed activity. [¶] (D) Require that final action on the proposed activity include the written responses of the issuing authority to significant environmental points raised during the evaluation process. [¶] (E) Require the filing of a notice of the decision by the administering agency on the proposed activity with the Secretary of the Resources Agency. Those notices shall be available for public inspection, and a list of the notices shall be posted on a weekly basis in the Office of the Resources Agency. Each list shall remain posted for a period of 30 days. [¶] (F) Require notice of the filing of the plan or other written documentation to be made to the public and to a person who requests, in writing, notification. The notification shall be made in a manner that will provide the public or a person requesting notification with sufficient time to review and comment on the filing. [¶] (3) The plan or other written documentation required by the regulatory program does both of the following: [¶] (A) Includes a description of the proposed activity with alternatives to the activity, and mitigation measures to minimize any significant adverse effect on the environment of the activity. [¶] (B) Is available for a reasonable time for review and comment by other public agencies and the general public."

exempt from the requirement of [environmental impact report] preparation *if* the program requires that a project be preceded by the preparation of a written report containing certain information on the environmental impacts of the project. ([Pub. Resources Code, § 21080.5, subd. (a).]) To qualify for such certification, the regulatory program must be governed by rules and regulations that: (1) require that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen any significant adverse impact the activity might have on the environment ([Pub. Resources Code, § 21080.5, subd. (d)(2)(i)]); (2) that include guidelines for the preparation of the project plan and for an evaluation of the proposed activity 'in a manner consistent with the environmental protection purposes of the regulatory program' ([Pub. Resources Code, § 21080.5, subd. (d)(2)(ii)]); (3) that require the administering agency to 'consult with all public agencies which have jurisdiction, by law, with respect to the proposed activity' ([Pub. Resources Code, § 21080.5, subd. (d)(2)(iii)]); and (4) that require that 'final action on the proposed activity include the written responses of the issuing authority to significant environmental points raised during the evaluation process.' ([Pub. Resources Code, § 21080.5, subd. (d)(2)(iv).]) The document that functions as the equivalent of an [environmental impact report] must also include a description of the proposed activity, its alternatives, and mitigation measures to minimize any significant adverse environmental impact, and must be available for a reasonable time for review and comment by other public agencies and the general public. ([Pub. Resources Code, § 21080.5, subd. (d)(3).])" (*Sierra Club v. State Bd. of Forestry, supra,* 7 Cal.4th at pp. 1229–1230.)

The substantive and procedural components for environmental documentation used in a certified regulatory program, which are pertinent to this appeal, are those specified in Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), and Guidelines section 15252, subdivision (a). Although we refer to them in footnote 8, *ante,* for clarity purposes, we reiterate here the relevant requirements imposed by Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3): "To qualify for certification pursuant to this section, a regulatory program shall require the utilization of an interdisciplinary approach that will ensure the integrated use of the natural and social sciences in decisionmaking and that shall meet all of the following criteria: [¶] . . . [¶] (2) The rules and regulations adopted by the administering agency for the regulatory program do all of the following: [¶] . . . [¶] (B) Include guidelines for the orderly evaluation of proposed activities and the preparation of the plan or other written documentation in a manner consistent with the environmental protection purposes of the regulatory program. [¶] . . . [¶] (D) Require that final action on the proposed activity include the written responses of the issuing authority to significant environmental points raised during the evaluation process. [¶] . . . [¶]

(F) Require notice of the filing of the plan or other written documentation to be made to the public and to a person who requests, in writing, notification. The notification shall be made in a manner that will provide the public or a person requesting notification with sufficient time to review and comment on the filing. [¶] (3) The plan or other written documentation required by the regulatory program does both of the following: [¶] (A) Includes a description of the proposed activity with alternatives to the activity, and mitigation measures to minimize any significant adverse effect on the environment of the activity. [¶] (B) Is available for a reasonable time for review and comment by other public agencies and the general public."

Further, Guidelines section 15252, subdivision (a) provides: "(a) The document used as a substitute for an [environmental impact report] or negative declaration in a certified program shall include at least the following items: [¶] (1) A description of the proposed activity, and [¶] (2) Either: [¶] (A) Alternatives to the activity and mitigation measures to avoid or reduce any significant or potentially significant effects that the project might have on the environment, or [¶] (B) A statement that the agency's review of the project showed that the project would not have any significant or potentially significant effects on the environment and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment. This statement shall be supported by a checklist or other documentation to show the possible effects that the agency examined in reaching this conclusion."

We apply the pertinent provisions of Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), and Guidelines section 15252, subdivision (a) in evaluating plaintiffs' procedural and substantive challenges to the commission's approval of the city's local coastal program amendment. Some of the parties' briefing relies on statutory and regulatory requirements for review of an environmental impact report. No doubt, there is an overlap between the requirements of a substitute document prepared for use in a certified regulatory program and those applicable to the preparation of an environmental impact report. We need not describe in detail how the requirements for a negative declaration or an environmental impact report, on one hand, and a certified program substitute document, on the other, differ or are the same. Rather, we apply the statutory and regulatory requirements specified in Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), and Guidelines section 15252, subdivision (a). We hold the commission's documentation complies with the relevant substantive and procedural requirements applicable to a certified regulatory program substitute document.

## 2. Public review period

■ The trial court refused to apply the seven-day review period for notice of public circulation of the commission staff report in California Code of Regulations, title 14, section 13532, which is part of the certified regulatory program approved by the secretary. California Code of Regulations, title 14, section 13530[9] requires a hearing be held on any proposed land use plan unless no substantial issue is raised by the proposal. California Code of Regulations, title 14, section 13532 requires the commission's executive director to prepare a staff recommendation prior to a hearing on a proposed land use plan. The staff recommendation must set forth specific findings, including a statement of facts and legal conclusions, as to whether a proposed land use plan conforms to the requirements of the Coastal Act and the commission's regulations. The proposed findings must include any suggested modifications necessary to bring the land use plan into compliance with the Coastal Act. (If the local government has requested that no modifications be part of the commission's action, then the staff report need not discuss any amendments.) The proposed findings must also include any additional documentation, governmental actions or other activity necessary to carry out the Coastal Act's requirements. (Cal. Code Regs., tit. 14, § 13532.) California Code of Regulations, title 14, section 13532 provides a timeframe for circulation of the staff report prior to the hearing, "In order to assure adequate notification the final staff recommendation shall be distributed to all commissioners, to the governing authority, to all affected cities and counties, and to all other agencies, individuals and organizations who have so requested or who are known by the executive director to have a particular interest in the [local coastal program or long range development plan], within a reasonable time but in no event less than 7 calendar days prior to the scheduled public hearing."[10] As noted, the commission gave 13 days' notice in the case. The

[9] California Code of Regulations, title 14, section 13530 states in its entirety: "Unless the Commission finds no substantial issue is raised by the land use plan, it shall conduct a public hearing on [t]he specific provisions of the land use plan that it has determined raise a substantial issue as to conformity with the policies of Chapter 3 of the California Coastal Act of 1976. The hearing may be conducted at the same meeting at which substantial issue is determined or at a later meeting. Notice and hearing procedures shall be the same as those set forth in Article 9. Final action shall be within ninety (90) days after submittal of land use plan, pursuant to Public Resources Code Section 30512."

[10] Section 13532 states in its entirety: "The executive director shall prepare a staff recommendation which shall set forth specific findings, including a statement of facts and legal conclusions as to whether or not the proposed land use plan or [long range development plan] conforms to the requirements of the California Coastal Act of 1976 and of these regulations. The proposed findings shall include any suggested modifications necessary to bring the land use plan or [long range development plan] into compliance with the California Coastal Act of 1976, unless the local government has requested that such modifications not be part of the Commission's action. The proposed findings shall also include any additional documentation, governmental actions or other activity necessary to carry out the requirements of the Coastal

trial court ruled the commission was obligated to comply with the longer 30-day public review period under Public Resources Code section 21091, subdivision (a), the timeframe applicable to draft environmental impact reports. We hold the commission's certified regulatory program is exempted from the notice and comment requirements of Public Resources Code section 21091, subdivision (a).

 As discussed, the commission's certified regulatory program was approved in 1979. (Guidelines, § 15251, subd. (f).)[11] The certified regulatory program includes the commission's regulations on certification of a local coastal program. Under the commission's regulations, a local government is required to provide maximum opportunities for public participation in the review and approval of local coastal program amendments and must provide notice and transmittal of documents at least six weeks prior to local government action. (Pub. Resources Code, § 30503; Cal. Code Regs., tit. 14, § 13515, subd. (c).) As noted, after a local government adopts the local coastal program amendment, it is submitted to the commission. Then, the commission's executive director prepares a summary of the local coastal program amendment accompanied by the staff's analysis and comments, (Cal. Code Regs., tit. 14, § 13532.) And as also noted, the commission's regulations require a seven-day notice period for public circulation of the staff report prior to the public hearing and adoption of a local coastal program amendment. (Cal. Code Regs., tit. 14, § 13532.)

 Under Public Resources Code section 21080.5, subdivision (d)(3)(B), a certified regulatory program's "plan or other written documentation" must be available for a reasonable time for review and comment by other agencies and the public.[12] Here, the secretary certified the commission's regulations relating to its review of local coastal program amendments

---

Act. In order to assure adequate notification the final staff recommendation shall be distributed to all commissioners, to the governing authority, to all affected cities and counties, and to all other agencies, individuals and organizations who have so requested or who are known by the executive director to have a particular interest in the [local coastal program] or [long range development plan], within a reasonable time but in no event less than 7 calendar days prior to the scheduled public hearing." (Cal. Code Regs., tit. 14, § 13532.)

[11] Guidelines section 15251, subdivision (f), states: "The following programs of state regulatory agencies have been certified by the Secretary for Resources as meeting the requirements of Section 21080.5: [¶] . . . [¶] (f) The program of the California Coastal Commission involving the preparation, approval, and certification of local coastal programs as provided in Sections 30500 through 30522 of the Public Resources Code."

[12] Public Resources Code section 21080.5, subdivision (d)(3)(B) states: "(d) To qualify for certification pursuant to this section, a regulatory program shall require the utilization of an interdisciplinary approach that will ensure the integrated use of the natural and social sciences in decisionmaking and that shall meet all of the following criteria: [¶] . . . [¶] (3) The plan or other written documentation required by the regulatory program does both of the following: [¶] . . . [¶] (B) Is available for a reasonable time for review and comment by other public agencies and the general public."

including the seven-day notice for staff reports. By providing 13 days' notice of the filing of the staff report, the commission complied with the California Environmental Quality Act. (See *Californians for Alternatives to Toxics v. Department of Pesticide Regulation, supra*, 136 Cal.App.4th at pp. 1067–1068 [complying with the terms of the Department of Pesticide Regulations certified regulatory program constitutes compliance with the Cal. Environmental Quality Act].) Given the May 22, 1979 certification of the commission's regulatory regime by the secretary, plaintiffs may not now challenge the seven-day notice provision in California Code of Regulations, title 14, section 13532. (Pub. Resources Code, § 21080.5, subd. (h); *Elk County Water Dist. v. Department of Forestry & Fire Protection, supra*, 53 Cal.App.4th at p. 10; *Laupheimer v. State of California, supra*, 200 Cal.App.3d at pp. 458–459.)

The trial court relied on *Ultramar, Inc. v. South Coast Air Quality Management Dist.* (1993) 17 Cal.App.4th 689, 702–703 [21 Cal.Rptr.2d 608], in imposing the 30-day review period for the staff report. *Ultramar* involved a certified regulatory program adopted by the South Coast Air Quality Management District. Rather than prepare an environmental impact report, the South Coast Air Quality Management District regulations permitted the agency to draft an abbreviated environmental assessment. (*Id.* at pp. 696–697.) The South Coast Air Quality Management District adopted the California Environmental Quality Act "implementation guidelines" which thereby included the Public Resources Code section 21091, subdivision (a) 30-day period for review of a draft abbreviated environmental assessment. (17 Cal.App.4th at pp. 696–700, 702–703.) Our colleagues in Division One of this appellate district held that since the South Coast Air Quality Management District's own certified program adopted the California Environmental Quality Act implementation guidelines, compliance with the Public Resources Code section 21091, subdivision (a) 30-day review period was mandatory. (17 Cal.App.4th at pp. 702–703.) (The term "implementation guidelines" did not refer to the regulatory provisions in the Guidelines.) Rather, the Court of Appeal explained that the secretary expected the same rules would apply to environmental impact reports and environmental assessments by the South Coast Air Quality Management District. (17 Cal.App.4th at p. 699.)

The trial court also relied on *Joy Road Area Forest & Watershed Assn. v. California Dept. of Forestry & Fire Protection* (2006) 142 Cal.App.4th 656, 667–668 [47 Cal.Rptr.3d 846]. In *Joy Road*, the Department of Forestry and Fire Protection approved a timber harvest plan without complying with the notice and recirculation requirements under Public Resources Code sections 21092 and 21092.1. (142 Cal.App.4th at p. 667.) The Court of Appeal held the Department of Forestry and Fire Protection's certified regulatory program

exemption from California Environmental Quality Act requirements did not extend to the agency's notice and recirculation provisions. (142 Cal.App.4th at p. 668.)

Neither *Ultramar* nor *Joy Road* is controlling. To begin with, Public Resources Code section 21174 provides for the primacy of the Coastal Act over the California Environmental Quality Act's statutory provisions: "No provision of this division is a limitation or restriction on the power or authority of any public agency in the enforcement or administration of any provision of law which it is specifically permitted or required to enforce or administer, including, but not limited to, the powers and authority granted to the California Coastal Commission pursuant to Division 20 (commencing with Section 30000). To the extent of any inconsistency or conflict between the provisions of the California Coastal Act of 1976 (Division 20 (commencing with Section 30000)) and the provisions of this division, the provisions of Division 20 (commencing with Section 30000) shall control." Our colleagues in Division Three of the Fourth Appellate District have explained: "In *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839 [28 Cal.Rptr.3d 316, 111 P.3d 294], the Supreme Court applied section 21174, stating, ' "To the extent of any inconsistency or conflict between the provisions of the . . . Coastal Act . . . and the provisions of [the California Environmental Quality Act], the provisions of [the Coastal Act] shall control." ' (35 Cal.4th at p. 859.)" (*Strother v. California Coastal Com.* (2009) 173 Cal.App.4th 873, 879–880 [92 Cal.Rptr.3d 831].) Further, the seven-day notice period is part of the commission's certified regulatory period and thus has the force of law. Here the commission, with its broad powers specified in Public Resources Code section 21174, was acting in compliance with a certified regulatory program which allows for a period in which to act that differs from the Public Resources Code section 21091, subdivision (a) 30-day review period. Neither *Ultramar* nor *Joy Road* involves a similar grant of power and a certified regulatory program which expressly deviates from the 30-day notice timeframe specified in Public Resources Code section 21091, subdivision (a) for a draft environmental impact report.

In addition, plaintiffs argue the commission violated Public Resources Code section 21080.5, subdivision (d)(3)(B) and California Code of Regulations, title 14, section 13532 because the staff report and addendum were not made available for a reasonable time for public review and comment. As noted (fn. 8, *ante*), Public Resources Code section 21080.5, subdivision (d)(3)(B) requires that the environmental documentation used in a certified regulatory program (in this case the staff report) must "be available for a reasonable time for review and comment" by other public agencies and the general public. In addition, the commission regulation in California Code of Regulations, title 14, section 13532 requires it to distribute the staff report

to the interested parties "within a reasonable time but in no event less than 7 calendar days prior" to the scheduled public hearing.

As discussed previously while synthesizing the trial court's California Environmental Quality Act analysis (see p. 920, *ante*), the trial court ruled the words "reasonableness" and "at least" in California Code of Regulations, title 14, section 13532 permitted it to make a case-by-case determination as to the reasonableness of the notice. The trial court found the 13-day comment period was not reasonable because the issues concerned a zoning amendment that affected more than the subject property; the issues were biological in nature; and the commission released the staff report addendum just two days before the hearing. Plaintiffs contend the evidence supports the trial court's ruling that the 13-day review period was unreasonable. In addition, plaintiffs argue the 13-day review period was not reasonable because the staff report discussed or referenced numerous biological reports and other documents, many of which had not previously been made available to the public.

 We disagree. The secretary is authorized to determine whether a regulatory program satisfies the "reasonable time for review and comment" requirement of Public Resources Code section 21080.5, subdivision (d)(3)(B). As we previously explained, plaintiffs may not now challenge the secretary's determination as to the "reasonable time for review and comment" under Public Resources Code section 21080.5, subdivision (d)(3)(B). This is because plaintiffs, or anybody else, were obligated to challenge the secretary's certification of the commission's regulatory program within 30 days from the date it was certified. Since the secretary certified the commission's regulatory program in 1979, plaintiff's challenge is untimely. (Pub. Resources Code, § 21080.5, subd. (h); *Elk County Water Dist. v. Department of Forestry & Fire Protection, supra*, 53 Cal.App.4th at p. 10; *Laupheimer v. State of California, supra*, 200 Cal.App.3d at pp. 458–459.)

We also respectfully disagree with the trial court's reasonableness ruling. We are required to defer to the commission's interpretation of its own regulations. Courts must defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise unless the challenged construction contradicts the clear language and purpose of the interpreted provision. (*Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 968 [103 Cal.Rptr.3d 383]; *Alberstone v. California Coastal Com., supra*, 169 Cal.App.4th at p. 866; *Divers' Environmental Conservation Organization v. State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246, 252 [51 Cal.Rptr.3d 497].) In addition, a case-by-case determination of reasonableness under California Code of Regulations, title 14, section 13532 without deference to the agency's interpretation would create unwarranted uncertainty in connection with many local coastal program amendment approvals. Such

would allow a party to challenge a commission action based on the alleged failure to circulate the staff report within a reasonable time period.

We conclude the staff report was available for a reasonable time for review and comment. The 13-day review period is nearly twice the period required by California Code of Regulations, title 14, section 13532. And there is no. evidence the public did not have adequate time to comment on the staff report. As noted, the trial court found there was no evidence that plaintiffs or other members of the public were prejudiced by the 13-day review period for the staff report. Although the addendum was issued only two days before the commission's public hearing, the addendum is not subject to the notice requirement under Code of Regulations, title 14, section 13532. In the addendum, the commission responded to public comments; recommended modification of the view corridors in response to public comments; and discussed additional biological information specific to the subject property's proposed subdivision.

 In addition, the staff report was available for a reasonable time given the ample public notice provided by the earlier stages of the local coastal program amendment process. The commission regulations require the city to make the proposed local coastal program amendment and relevant studies or documents available for public review at least six weeks prior to the city's action. (Cal. Code Regs., tit. 14, § 13515, subd. (c).) The city must then summarize significant public comments and its response to the comments as part of the local coastal program amendment submittal to the commission. (Cal. Code Regs., tit. 14, § 13552.) Also, the city provided the public opportunities to comment on the proposed local coastal program amendment and mitigated negative declaration at three city public meetings. Thus, the staff report was the culmination of a process that allowed for public review and input on the local coastal program amendment at earlier stages.

### 3. Lead agency

The commission contends the trial court erred in requiring compliance with provisions of the California Environmental Quality Act that apply only to lead agencies. The commission argues it was the responsible, not the lead, agency. The commission reasons the city was the first public agency to review the project. The commission asserts the city is the only agency involved in review of the project that has general governmental powers. The commission argues as the responsible agency, it does not have to comply with California Environmental Quality Act provisions regarding public review requirements; response to public comments; alternatives analysis; and cumulative impact analysis. These requirements, the commission notes, only specifically apply to the preparation, review and certification of environmental documentation by lead agencies.

■ Public Resources Code section 21067 defines, "lead agency" as the public agency with the principal responsibility for approving a project. Public Resources Code section 21069 defines a "responsible agency" as any other public agency that shares responsibility for approving a project. In some cases, two or more public entities may qualify as lead agencies. In that case, the entity that acts first is the lead agency. (*Citizens Task Force on Sohio v. Board of Harbor Commissioners* (1979) 23 Cal.3d 812, 814 [153 Cal.Rptr. 584, 591 P.2d 1236]; Guidelines, § 15051, subd. (c).)

■ Under Public Resources Code section 21080.5, both the city and the commission are exempted from preparing an environmental impact report prior to approval of a local coastal program amendment. (Pub. Resources Code, §§ 21080.5, 21080.9; *Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara* (2004) 121 Cal.App.4th 864, 873 [17 Cal.Rptr.3d 489].) Under Guidelines section 15265: " '(a) [The California Environmental Quality Act] does not apply to activities and approvals pursuant to the California Coastal Act . . . by: [¶] (1) Any local government . . . necessary for the preparation and adoption of a local coastal program . . . . [¶] . . . [¶] (c) This section shifts the burden of [California Environmental Quality Act] compliance from the local agency . . . to the California Coastal Commission. . . .' " (*Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara, supra*, 121 Cal.App.4th at p. 873.) Thus, the commission, not the city, has the burden of complying with the California Environmental Quality Act in connection with the local coastal program amendments. But, as noted, the commission is exempted from preparing an environmental impact report because of the secretary's approval of its certified regulatory program. Thus, the commission must only comply with the environmental documentation requirements in Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), which are synthesized in detail in *Sierra Club v. State Bd. of Forestry, supra*, 7 Cal.4th at pages 1229–1230, and Guidelines section 15252, subdivision (a). Hence, no environmental impact report had to be prepared in this case. Nor are the requirements imposed on a lead agency for preparation of an environmental impact report applicable to the commission's environmental decisionmaking.

### 4. Adequacy of response to public comments

The trial court ruled the commission failed to respond to plaintiffs' comments on cumulative impacts. We disagree. For purposes of Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), and Guidelines section 15252, subdivision (a), the commission adequately responded to plaintiffs' comments on the cumulative effects of adoption of the local coastal program amendment. Plaintiffs commented that the local coastal

program amendment would cause view corridor impacts, accelerate erosion, reduce bluewater views, and threaten the integrity of environmentally sensitive habitat areas. Plaintiffs generally commented that the local coastal program amendment "could result in significant direct, indirect, and cumulative effects" on the environment in the areas of land use, environmentally sensitive habitat areas, view corridors and parking. The June 9, 2008 staff report addendum responded that although the 45-foot width standard would apply to all beachfront parcels zoned single-family medium density, the only vacant site that would be affected was the subject property; two other properties could be affected by the new 45-foot width standard only if the existing structures were demolished; and the review of environmentally sensitive habitat areas had been conducted to a level of specificity that would normally be carried out at a coastal development permit juncture, rather than a local coastal program approval stage.

The June 9, 2008 staff report addendum also addressed comments regarding view resources. The staff recommended the addition of section 6.5.E.6 to the city's Local Implementation Plan to require "no less than [20 percent] of the lineal frontage of each newly created parcel . . . be maintained as one contiguous public view corridor" even if the new lots were 50 feet or less in width. Thus, the commission responded to plaintiffs' general comments about land use and environmentally sensitive habitat areas. Further, the commission added Local Implementation Plan section 6.5.E.6 in response to plaintiffs' specific comment about the view corridor impacts. In addition, the commission also considered the city's responses to plaintiffs' comments.

Plaintiffs also generally commented that the mitigated negative declaration failed to adequately discuss potential cumulative impacts to biological resources, view corridors, land use, parking, traffic and hydrology and water quality. Plaintiffs argued the local coastal program amendment allowed for great density as lots could be combined and then readjusted to form additional buildable parcels along the entire coastline. The city staff's responses to these general comments are found in the November 28, 2006 report. Authored by an assistant planner, the report explained the city staff's methodology for identifying the lots which would be affected by the local coastal program amendment and stated that the development pattern would be consistent with existing patterns and parcel widths. The report further stated cumulative impacts were negligible because mitigation measures would be imposed on the subject property and the local coastal program amendment applied to only two other recently developed lots in the city. The city and the commission adequately responded to plaintiffs' comments regarding cumulative impacts during the local coastal program amendment process. No violation of the content requirements imposed by Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3) or Guidelines section 15252, subdivision (a) occurred.

## 5. Project Alternatives

The trial court found the commission's staff report failed as an informational document on the alternatives of a wider view corridor and whether fewer lots should result from the subdivision of the subject property. The trial court noted that the city considered alternatives by comparing view corridors and development envelopes for one, two, three and four lots on the subject property. The trial court further stated that the city found that four lots resulted in the smallest development footprint; provided the greatest viewing area; and was the least environmentally damaging alternative. Despite acknowledging the city's foregoing analysis, the trial court ruled, "[The commission] staff report does not even say that it is relying on the [c]ity's analysis of alternatives . . . ." As previously noted, the trial court also found: "[T]here is no analysis of the view corridors for the other two lots affected by the [local coastal program] amendment, and whether different development envelopes would mitigate view impacts from those lots. The [c]ommission did impose [Local Implementation Plan] [s]ection 6.5(E), which would prevent a reduction in view corridor for those two lots, but provides no analysis of the view corridors and development envelopes [for] those two lots." The commission, city and the developer contend the commission adequately considered alternatives to the project. We agree.

The commission staff report considered reasonable alternatives to the local coastal program amendment. The commission staff report considered alternatives to the proposed four-lot configuration. The commission staff report discussed a potential layout of the subject property with two lots with 100-foot widths; one lot with a 200-foot width; as well as lot configurations with different view corridors. The commission found that under the local coastal program amendment, as initially proffered by the city, smaller view corridors on either side of subdivided parcels could occur which would impact visual resources. To mitigate this problem, the commission considered the alternative of requiring greater view corridors for lots that could be subdivided under the local coastal program. As noted, the commission required amendment to the city's Local Implementation Plan section 6.5.E, which as ultimately certified, mandates larger view corridors for subdivided parcels where the resultant lots are 50 feet or less in width.

In addition, the city submitted its alternatives analysis to the commission. The commission considered the city's alternatives analysis as part of the local coastal program amendment process. The city compared view corridors and development footprints for one, two, three and four lots on the subject

property. The city found that four lots resulted in the greatest viewing area, the smallest development footprint and the least environmentally damaging alternative. Thus, the entire administrative record before the commission demonstrates consideration of alternatives to the city's proposed coastal program amendment.

### 6. The parties' cumulative impact contentions

#### a. Plaintiffs' arguments

As noted, plaintiffs appealed from that portion of the judgment which did not favor them. Plaintiffs contend the trial court erred in accepting the commission's unsupported conclusion that the local coastal program amendment would allow for subdivision of no more than three lots. We evaluate this contention in the context of whether the commission staff report complies with the requirements imposed in Public Resources Code section 21080.5, subdivision (d)(2)(B), (D), (F) and (3), and Guidelines section 15252, subdivision (a). As noted, in the revised initial study and mitigated negative declaration, the city council found only two developed lots which could potentially, under the local coastal program amendment, be subdivided to create an additional parcel each in the event of the demolition of the existing single-family homes. To subdivide, the owners of these two developed parcels would be required to apply for coastal development permits and environmental review under the California Environmental Quality Act. The city staff's discussion concerning the two currently developed lots in the revised initial study and mitigated negative declaration was part of the analysis as to why the local coastal program amendment would have negligible direct and cumulative impacts on aesthetics, biological resources and land use and planning.

The commission staff report relied on the city staff's analysis of the number and location of the lots, other than the subject property, that could be affected by the local coastal program amendment. The commission staff report discussed in depth the city staff findings incorporated into the mitigated negative declaration The commission staff report cited to the following analysis by the city staff: the categorization of parcels as either vacant or developed; the evaluation of both the lot width and size; the finding that only 16 lots, which have lot widths of at least 90 feet, could be potentially subdivided under the local coastal program amendment's 45-foot lot width standard; of the 16 lots, four parcels could not be subdivided because they do not have the minimum required acreage; another eight lots could not be subdivided under Local Implementation Plan section 10.4.R because they would require shoreline protection devices; the conclusion that only four developed

lots could be potentially subdivided under the local coastal program amendment; the finding that two of the parcels resulted from prior lot ties or mergers; and these two lots were created by combining smaller, approximately 50-foot-wide parcels. Thus, only the aforementioned two developed parcels could potentially be subdivided under the local coastal program amendment.

In the face of this evidence, plaintiffs argue there is no legal or factual basis to conclude that the two previously tied or merged lots could not be subdivided under the local coastal program amendment. And plaintiffs argue the commission, itself, should be required to conduct environmental review on these two lots. Plaintiffs also contend the local coastal program amendment could have additional environmental impacts associated with the creation of new lots because developed adjoining properties could potentially merge and subdivide into more parcels. Plaintiffs conclude this part of their analysis by arguing the trial court should have required review of all lots in the city that could be divided. We disagree.

No provision of law required the commission to *speculate* on the environmental impacts of the two previously tied parcels or on lots that could be created in the future through purchase of developed adjoining properties that could be merged and subdivided. Moreover, the two previously tied lots are unlikely to be subdivided because they were tied through a covenant and there is no evidence the city would allow redivision of those lots. (Civ. Code, §§ 1460, 1465 [a covenant running with the land binds successors]; *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 352–355 [47 Cal.Rptr.2d 898, 906 P.2d 1314] [same].) In addition, any future subdivision of already developed lots would require a coastal development permit. The future subdivided lots would need to comply with all the requirements of the local coastal program, including provisions regarding minimum lot size, protection of coastal resources including environmentally sensitive habitat areas, and restrictions on mergers and subdivisions.

### b. The two developed lots—the appeals of the commission, the city and the developer

The commission, city and developer argue it was error for the trial court to require further environmental analyses on the two developed lots that could potentially be subdivided under the local coastal program amendment. They

contend the California Environmental Quality Act does not require a lot-by-lot environmental analysis for the local coastal program amendment, which sets forth the land use standards for development. We agree.

In response to the developer's request for a coastal development permit, the city and commission obtained information on the existing views; proposed view corridors; and dune environmentally sensitive habitat areas for the subject property. The commission properly considered the secondary effects that could follow from the local coastal program amendment of the lot width standard. The commission staff report found the local coastal program amendment, as initially submitted by the city, would increase the number of smaller sized lots. This would in turn result in smaller view corridors. Because the local coastal program amendment could have a significant adverse effect on visual resources, the commission lessened these view impacts to below a level of significance by requiring the adoption of Local Implementation Plan section 6.5.E.6. As noted, this amendment created larger view corridors from Pacific Coast Highway to the ocean. New Local Implementation Plan section 6.5.E.6 requires a minimum of 20 percent of the lineal frontage of each newly created parcel be maintained as one contiguous public view corridor even if the lots are 50 feet or less in width.

In addition, the commission staff report also discussed the general conditions of dune environmentally sensitive habitat areas in the city. The commission staff report indicated the dunes range from lightly to heavily impacted and were invaded by nonnative plants. According to the city's biologist, Mr. Crawford, the remnant dunes in Malibu are highly disturbed and have limited function and value. Mr. Crawford stated, "The majority of the dunes remaining in Malibu support predominately non-native and invasive ice plant, that not only out-competes (and often eliminates) the native dune vegetation, but over-stabilizes the dunes, thus resulting in an unnatural condition that prevents the natural 'movement' of the dunes and reduces their value as native habitat."

In light of the foregoing environmental analysis, the commission was not required to conduct site-specific biological reports on the two developed lots that might someday subdivide. It is unreasonable to require the commission, city or developer to conduct a biological assessment on developed private property it does not own and for which there is no reason to expect will be subdivided. Should these two developed lots be subdivided in the future, their owners would need to obtain coastal development permits, which would require site-specific environmental impact analyses, including reviews of environmentally sensitive habitat areas on the lots. No further discussion was necessary.

## IV. DISPOSITION

The judgment is reversed insofar as it granted the mandate petition. The judgment is affirmed in all other respects. Upon remittitur issuance, the trial court is to deny the mandate petition in its entirety. The California Coastal Commission, City of Malibu and Malibu Bay Company shall recover their costs incurred on appeal from plaintiffs, Deane Earl Ross individually and as cotrustee of the Ross Family Trust.

Kriegler, J., and Kumar, J.,* concurred.

A petition for a rehearing was denied October 11, 2011, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied January 4, 2012, S197305.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.