Filed 4/1/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MOUNTAINLANDS CONSERVANCY, LLC, et al., | B287079 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS149063) |
| v. | |
| CALIFORNIA COASTAL COMMISSION, | |
| Defendant and Respondent; | |
| COUNTY OF LOS ANGELES, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Affirmed.

Bradley & Gmelich, Barry A. Bradley, Lena J. Marderosian, and Dawn Cushman for Plaintiffs and Appellants.

Damien M. Schiff for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Christina Bull Arndt, Supervising

Deputy Attorney General, and David Edsall Jr., Deputy Attorney General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

_____

**SUMMARY**

This is an appeal from a decision of the California Coastal Commission certifying a local coastal program for the Santa Monica Mountains that prohibits any new vineyards in the Santa Monica Mountains coastal zone.

Three limited liability companies that own land subject to the local coastal program sought a writ of mandate to vacate the certification, challenging the commission's decision on both procedural and substantive grounds. The trial court denied the writ petition.

We affirm the judgment.

**LEGAL AND FACTUAL BACKGROUND**

**1.	The Legal Background:  General Principles**

The California Coastal Act (the Coastal Act) was passed in 1976.  (Pub. Resources Code, § 30000 et seq.)[1]  It is "a comprehensive scheme to govern land use planning for the entire coastal zone of California."  (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 (*Yost*).)  The Coastal Act requires "all local governments lying in whole or in part within the coastal zone . . . to prepare and submit to the Commission a local coastal plan."  (*Yost,* at p. 566, citing § 30500, subd. (a).)

_____

[1]	Unless otherwise specified, further statutory references are to the Public Resources Code.

A local coastal program (or LCP) is defined as "a local government's (a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions . . . ." (§ 30108.6.) "The precise content of each local coastal program shall be determined by the local government . . . in full consultation with the commission and with full public participation." (§ 30500, subd. (c).)

The local coastal program may be submitted to the commission all at once or in two phases. The two phases are, first, the land use plan (or LUP), and second, the zoning ordinances, zoning maps and any other implementing actions (§ 30511). (The parties refer to these zoning ordinances and other implementing actions as a "local implementation plan" or LIP.)

The commission will certify a land use plan, or any amendments to it, if the land use plan "meets the requirements of, and is in conformity with, the policies of Chapter 3 (commencing with Section 30200)." (§ 30512, subd. (c); *Yost, supra,* 36 Cal.3d at p. 566.) These are referred to as "chapter 3 policies." They include policies on land resources (§§ 30240-30244), a category that includes environmentally sensitive habitat areas (§ 30240) and agricultural lands. The latter policies include a section on prime agricultural land (§ 30241) and a section on all other lands suitable for agricultural use (§ 30242).[2] Conflicts between one or more policies of the Coastal Act are to be resolved "in a manner which on balance is the most protective of significant coastal resources." (§ 30007.5.)

---

[2] Other chapter 3 policies include policies on public access, recreation, marine environment, development, and industrial development. (§§ 30210-30236, 30250-30265.5.)

The commission's review of a local government's land use plan is expressly limited to its determination that the plan "does, or does not, conform with" the requirements of chapter 3. (§ 30512.2, subd. (a).)  As for the second-phase implementing actions (the local implementation plan), "[t]he Commission may only reject zoning ordinances on the grounds that they do not conform, or are inadequate to carry out the provisions of the certified land use plan." (*Yost*, *supra,* 36 Cal.3d at p. 566, citing § 30513.)

"A certified local coastal program and all local implementing ordinances, regulations, and other actions may be amended by a local government, but no such amendment shall take effect until it has been certified by the commission."  (§ 30514, subd. (a).)

2.    **The Factual and Procedural Background**

Los Angeles County (the county) has divided its coastal zone into three areas.  One of these is the Santa Monica Mountains.

In 1986, the commission certified the land use plan portion of a proposed local coastal program for the Santa Monica Mountains. (This is referred to as the 1986 Malibu land use plan.)  No zoning ordinances or other implementing actions were adopted or certified, so the county did not have a complete certified local coastal program for the Santa Monica Mountains.  (This meant that the commission retained jurisdiction over land use in the Santa Monica Mountains, and applicants for any development project in that coastal zone had to obtain permits from the commission rather than from the county.)

In 2007, the county's regional planning commission recommended approval of a proposed local coastal program that included an "updated land use plan . . . to replace the Malibu LUP" as well as a proposed local implementation plan.  The Board of

4

Supervisors (the board) indicated its intent to approve the proposed program with modifications, but the commission never considered or certified it.

In 2012, the commission began to encourage certification of uncertified areas and to work with local agencies to update existing coastal plans. After negotiations between commission staff and the county, clarifications and amendments were made to the 2007 proposed local coastal program.

### a. The county's proposed local coastal program

On January 2, 2014, the county gave notice the board would consider a proposed local coastal program for the Santa Monica Mountains at a public hearing on February 11, 2014.

The county's proposed program included a land use plan replacing the 1986 Malibu land use plan, and an implementation plan with amendments to the zoning code and a zone change ordinance. The county summarized the major differences between the 1986 Malibu land use plan and "the current amendment to the land use plan," and stated that "this amendment will replace the 1986 LUP in its entirety."

Among the significant differences was that "[a]gricultural uses are proposed for restriction in the proposed [local coastal program]." For reasons the county enumerated, "the County has elected to respect the vineyards and crop areas already in existence, and to prohibit further establishment of such uses in the future." Another significant difference involved critical habitat; in the 1986 plan, "there was a far smaller designation of critical habitat than is now presented as H1." ("H1" is the designation for "[t]he most sensitive and geographically constrained habitats.")

5

The board held a public hearing, and on February 18, 2014, approved a resolution stating its intent to approve the proposed program and submit it to the commission.

### b. The commission staff's March 27 report

On March 27, 2014, the commission staff issued a report on the county's proposed land use plan amendment. The staff recommended denial as submitted, but recommended approval subject to 60 suggested modifications. Most were clarifications and refinements, but several modifications were suggested as necessary to ensure the land use plan was in conformity with chapter 3 policies.

As relevant here, in modification No. 27, the staff clarified the provision prohibiting new crop, orchard, vineyard, and other crop-based nonlivestock agricultural uses, adding that existing agricultural uses "may not be expanded." The staff also suggested a new policy (modification No. 28) stating that "[e]xisting, legally-established, economically-viable crop-based agricultural uses on lands suitable for agricultural use shall not be converted to non-agricultural use" unless certain requirements were met. (This modification tracked a policy stated in section 30242 of the Coastal Act, described *post*.) The staff also suggested (modification No. 29) deleting a provision that limited "existing commercial or 'hobby' agricultural uses such as vineyards, orchards, and field or row crops," but again specified that existing agricultural uses may not be expanded.

The commission staff's report reviewed sections 30241 and 30242 of the Coastal Act (the policies on agricultural land). Section 30241 specifies that the "maximum amount of prime agricultural land shall be maintained in agricultural production to assure the protection of the areas' agricultural economy, and

6

conflicts shall be minimized between agricultural and urban land uses" through several stated policies. Section 30242 governs other agricultural land, and states that lands "suitable for agricultural use shall not be converted to nonagricultural uses unless (1) continued or renewed agricultural use is not feasible, or (2) such conversion would preserve prime agricultural land or concentrate development consistent with [other specified policies]."

The staff report concluded section 30241's mandate to maintain the maximum amount of prime agricultural land in agricultural production did not apply. This was because the "limited lands within the plan area that contain prime agricultural soils are either State or Federal public parkland or are developed with existing uses and not in agricultural production."[3]

Further, "other lands in existing agricultural use and suitable for agricultural use are very limited in area. [A] large percentage of the plan area consist[s] of very steep slopes and poor soils, which are unsuitable for agriculture. . . . The steep slopes, poor soils, limited water availability, and other constraints within the Santa Monica Mountains make . . . the cultivation of vineyards and other crops either infeasible, or extremely difficult and costly." In addition, "[a]ctivities such as vineyards or other intensive crop cultivation can have significant adverse impacts on the biological

---

[3] The staff report explains in detail the meaning of "prime agricultural land" under the Coastal Act. The definition (§ 30113) includes four categories described in Government Code section 51201, one of which is "[l]and planted with fruit- or nut-bearing trees, vines, bushes, or crops which have a nonbearing period of less than five years" and which will normally return "not less than two hundred dollars ($200) per acre" on an annual basis. (Gov. Code, § 51201, subd. (c)(4).)

7

integrity of the surrounding mountain environment and receiving waterbodies." The staff described a "confluence of factors— including steep slopes, poor soils, scenic considerations, sensitive watersheds, abundant [environmentally sensitive habitat areas], and lot size limitations—[t]hat render the vast majority of the land in the Santa Monica Mountains unsuitable for agricultural use." Consequently, "the prohibition on the conversion of lands suitable for agricultural use to non-agricultural use" in section 30242 "does not apply in most cases in this unique plan area."

The report stated that the only areas in existing agricultural production were "very limited vineyard areas, encompassing a very small percentage of the plan area." The "very limited areas where agriculture is possible" were "the one or two areas that are already in active agricultural production," and these were to be protected by modification No. 28. These two vineyard areas encompassed approximately 50 acres. "Otherwise, the remaining vineyards in the plan area are a very limited number of very small, 'hobby' vineyard plots (less than 2 acres) that are accessory to single-family residences," and "these areas are very limited and often not commercially viable."

The staff report also stated that the "protection and preservation of the environmentally sensitive habitats in the Santa Monica Mountains is the most significant issue in this LUP." The report described the plan's "biological resource protection approach" and the three categories of habitat designated in the plan (H1, H2 and H3). "H1 and H2 habitats are collectively described as Sensitive Environmental Resource Areas (SERA's)." As noted earlier, the designation "H1" is for the "most sensitive and geographically constrained habitats." "H2 habitat consists of areas of high biological significance, rarity, and sensitivity that are

8

important for the ecological vitality and diversity of the Santa Monica Mountains Mediterranean Ecosystem." "H3 habitats are developed or legally disturbed areas that may retain some residual habitat values, but are not considered to be ESHA [environmentally sensitive habitat areas]."[4] More than 87 percent of the 50,000 acres in the land use plan is designated either H1 or H2.

### c. Public comments

On April 7, 2014, plaintiffs—Mountainlands Conservancy, LLC; Third District Parklands, LLC; and Third District Meadowlands, LLC – submitted their comments. They contended the proposed land use plan, even with the staff's proposed modifications, "raises substantial issues as to conformity with" chapter 3 policies, in particular the "policy of preserving land in the Coastal Zone for agriculture." Plaintiffs asked the commission either to decline certification or to "set an additional hearing on all matters that raise such 'substantial issues.' " (Section 30512 requires an additional hearing under specified circumstances, as we discuss *post*.)

Specifically, plaintiffs first challenged the staff's finding that the only prime agricultural soils were located in public parkland areas or developed with existing uses. Plaintiffs said they were "aware of at least one property within the Coastal Zone containing a deed restriction indicating the presence of 'prime agricultural

---

[4] The Coastal Act defines " '[e]nvironmentally sensitive area' " as "any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments." (§ 30107.5.)

land' on that property." (Plaintiffs did not identify or document this property.)

Plaintiffs also challenged the staff's conclusion that the vast majority of land in the Santa Monica Mountains was unsuitable for agricultural use. Plaintiffs contended these findings were "purely speculative"; and the report contained "no information on the amount of land . . . that is currently under cultivation," and no persuasive explanation of why there is no further land suitable for agriculture.

Plaintiffs attached an expert report from Daryl Koutnik on agricultural use opportunities in the Santa Monica Mountains. Mr. Koutnik, who stated he was a principal in "Biological and Environmental Compliance," provided a list of soil types in the Santa Monica Mountains suitable for agriculture. He concluded the staff report's dismissal of agricultural uses "based solely on soils being too rocky and steeply sloping . . . does not correspond to current successful agricultural operations in the area." With modern practices, various crops "may be successful on a variety of soil types and slope steepness," and "[f]arming and engineering techniques are available to address water quality and erosional concerns." The limitation of agricultural uses to only those designated by the Department of Conservation based on soil types and recent or current operation "while prohibiting such use for properties that have been historical[ly] used for such practices is a substantial change from the current zoning designations that allow these agricultural activities."

Plaintiffs submitted a soil survey of the Santa Monica Mountains National Recreation Area (as well as other soil surveys, soil maps and related materials). The Santa Monica Mountains survey stated that "[a]bout 3,470 acres, or less than 2 percent of

the survey area, would meet the requirements for prime farmland if an adequate and dependable supply of irrigation water were available."

Plaintiffs also submitted an opinion from geologist Scott Hogrefe, to refute the staff's assertion that the Santa Monica Mountains, because of steep topography, poor soils, limited water availability, and constrained access, have never been an area particular conducive for agriculture. Mr. Hogrefe, who has been a consulting geologist on many properties in the area during the past 30 years, opined that the "vast majority of sites across the Santa Monica Mountains do contain good to excellent soil conditions for agricultural purposes."

### d.    The commission staff's April 9 addendum

On April 9, 2014, the commission staff issued an addendum to its March 27 report, one day in advance of the April 10 public hearing. Among other matters, the April 9 addendum responded to concerns raised by the public, including by plaintiffs, about the proposed prohibition of all new crop-based agriculture. The addendum stated the commission staff had conferred with county staff and agreed on some proposed changes, including its recommendations on modifications No. 27 and 29, "to temper the wholesale prohibition on new crop-based agriculture that appears in the County's original proposal."

The trial court aptly summarized the recommended changes. "In light of the comments received," commission staff recommended a modification "to allow new agricultural uses that met the following criteria:  (1) the new agricultural uses are limited to specified areas on natural slopes of 3:1 or less steep, or areas currently in legal agricultural use; (2) new vineyards are prohibited; and (3) organic or biodynamic farming practices are

11

followed." The commission staff "removed the prohibition on expanding agricultural uses, and recommended that existing legal agricultural uses may be expanded consistent with" the three criteria just mentioned. The commission staff "recognized that the continuation of agricultural uses" is encouraged under the Coastal Act if those uses "can be accomplished consistent with other Chapter 3 policies."

The commission staff's new findings "justified the allowance for new agriculture because 'small-scale crop-based agricultural operations (with the exceptions of vineyards) can avoid adverse impact to biological resources and water quality,' if 'organic and biodynamic farming practices are followed.'" The staff "explained that 'organic and biodynamic farming practices are required to prevent the use of pesticides, herbicides, and fertilizers, which can adversely impact the biological productivity of coastal waters and human health.'" New vineyards "would remain prohibited due to a number of identified adverse impacts attributed specifically to those operations, including increased erosion from removal of all vegetation, use of pesticides, large amounts of water required, their invasive nature, and their adverse impact to scenic views."

### e. Plaintiffs' response

Plaintiffs responded to the April 9 addendum on April 10, the date of the public hearing.

First, plaintiffs contended that allowing affected parties less than 24 hours to respond to the proposed revisions would violate section 30503. (Section 30503 requires the public to be provided with "maximum opportunities to participate" during the preparation, approval, certification, and amendment of any local coastal program.)

12

Second, plaintiffs argued that even as revised, the proposed land use plan "still raises substantial issues as to its compliance" with chapter 3 policies, so that the commission "must set an additional hearing to discuss those issues." Plaintiffs cited three "substantial issues."

Plaintiffs said the revised proposal "would still exclude new agriculture from the vast majority of land" in the Santa Monica Mountains coastal zone. This was because new agriculture was allowed, with two limited exceptions, "only in certain H3 habitat areas," and "the bulk of the area in the Coastal Zone is designated H1 or H2." Plaintiffs cited Dr. Hogrefe's report that the vast majority of land was suitable for agricultural use. Plaintiffs asserted that "[t]o the extent that land that had potentially been available for agricultural use would now be unavailable due to its classification as H1 or H2 habitat, the proposed [land use plan] as revised by the Staff's Addendum conflicts with the policy expressed in Section 30242 of the Coastal Act against conversion of land suitable for agricultural use to nonagricultural land."

Plaintiffs also challenged the staff's justification for the prohibition of new vineyards, contending the staff's statements (reproduced in the next footnote)[5] were "newly presented

_____

[5]    "Vineyards require the removal of all native vegetation and the soils must be scarified which results in increased erosion and sedimentation of streams which adversely impact riparian areas and water quality. In addition, vineyards typically require the application of pesticides that can also adversely impact coast streams and riparian habitat. Furthermore, vineyards require large amounts of water that can require agricultural wells that can draw down ground water and adversely impact streams and seeps and their associated habitats. Moreover, County staff asserts that grapevines can be an invasive type of vegetation in riparian areas.

13

. . .without substantiation and without the benefit of public comment." (Plaintiffs similarly challenged the limitation of additional agriculture solely to organic and biodynamic farming methods, but they do not pursue this point on appeal.)

In addition, plaintiffs submitted two documents for the record. The one relevant to this appeal is a June 2012 study prepared by researchers at the UCLA Institute of the Environment & Sustainability, entitled "Potential Extent of Vineyard Development in the Santa Monica Mountain National Recreation Area [SMMNRA]" (the UCLA study). The UCLA study sought to identify "areas where vineyard development could potentially occur given current zoning and land use regulations," and stated that, of the 48,394 acres in the study site, 62.5 percent had favorable physical conditions and appropriate zoning for development. In addition to potential vineyard development, the report identified existing vineyards in the area (38, some with slopes greater than 33 percent). These included "large commercial vineyards, as well as small hobby vineyards." (We will describe the UCLA study further in connection with our legal discussion of plaintiffs' substantial evidence claim.)

f.     **The April 10 hearing and subsequent proceedings**

After presentations by county and commission staff, the commission heard from many members of the public. Counsel for plaintiffs argued the commission had a duty to determine whether there were any substantial issues concerning the compliance of the

---

Finally, given that grapevines must be supported by trellises in a linear, unnatural pattern, vineyards can adversely impact scenic views."

land use plan with chapter 3 policies, and that there were such issues, "especially with compliance with section 30242."

Counsel also expressed agreement with much of the position presented by a representative of the California Coalition of Coastal Farmers (Mr. Don Schmitz), who spoke at some length about prime agricultural land in the Santa Monica Mountains and against the restriction on vineyards. Mr. Schmitz reported that the entire Santa Monica Mountains area had been approved by federal authorities as a fine wine growing region (designated an AVA or American Viticultural Area).

The commission voted unanimously to approve the land use plan with the modifications suggested by the commission staff.

Three months later, after a staff report, objections from plaintiffs, and a public hearing, the commission approved the county's proposed local implementation plan, with modifications. On August 26, 2014, the board issued a resolution adopting the local coastal program, consisting of the land use plan and the local implementation plan, both as modified by the commission. Final commission certification took place at its meeting on October 10, 2014.

### g.     The writ petition proceedings

In June 2014, after the commission's approval of the land use plan, plaintiffs filed a petition for writ of mandate. The amended petition filed December 9, 2014, is the operative pleading. Plaintiffs alleged the commission did not proceed in the manner required by law, because it did not make a "substantial issues" determination under section 30512. Even with the modifications in the April 9 addendum, they alleged, the proposed land use plan raised substantial issues of conformity with sections 30241 and 30242. They claimed the plan "converted lands

15

suitable for agricultural use to non-agricultural use in violation of Section 30242." They asserted that all lands of greater than 3:1 slope were converted to nonagricultural use, as were "all lands in the 87.9% of the Coastal Zone designated as H1 or H2," with limited exceptions. Plaintiffs alleged the commission was required to conduct a further hearing on those issues.

Plaintiffs also alleged that, by considering the addendum made available to the public the day before the hearing, the commission denied them a meaningful opportunity to address the findings that "new vineyards deserved to be separated from other forms of agriculture for categorical prohibition."

Plaintiffs further alleged the commission's findings were not supported by substantial evidence, including insufficient evidence to justify a categorical prohibition of vineyards as opposed to other types of agriculture.

The trial court denied plaintiffs' petition, issuing two comprehensive rulings.

In its first ruling, the court rejected plaintiffs' claim that the April 9 addendum was required to be distributed at least seven days before the public hearing, and ruled that even if there were such a requirement, plaintiffs could not show they were prejudiced by the addendum's timing. The court further concluded the commission was not required under section 30512 to hold a separate hearing on the matters claimed by plaintiffs to raise "substantial issues." The proposed land use plan was an amendment of the 1986 Malibu plan, so that the amendment procedure under section 30514 applied, not section 30512. In addition, the court found the commission correctly concluded that section 30241—requiring that the maximum amount of prime agricultural land be maintained in production—did not apply.

16

And, the court found substantial evidence supported the commission's findings "that a large percentage of the plan area is not suitable for agricultural use and not subject to section 30242's restriction on the conversion of lands suitable for agricultural use."

The trial court continued the hearing and ordered further briefing, limited to the question whether the total ban on vineyards was supported by substantial evidence. Along with their supplemental brief, plaintiffs filed a motion to augment the record with documents relating to the federal designation of the Santa Monica Mountains coastal region as an American Viticultural Area. At the continued hearing, the court denied the motion as unauthorized and untimely.

In its second ruling, the court described and analyzed the evidence in great detail, concluding there was substantial evidence that vineyards are harmful to the Santa Monica Mountains ecology "because they require clearing and scarification, increase erosion and sedimentation, require pesticide use, and constitute an invasive monoculture." Further, "[o]f these harms, many are inherent to the nature of viticulture, and there is no evidence that they could be mitigated."

Judgment was entered on November 20, 2017, and this appeal followed.

## DISCUSSION

With minor variations, plaintiffs make the same claims they made to the trial court: that section 30512 applied and mandated a further hearing; that the commission failed to enforce the agricultural protection policies of the Coastal Act; that the hearing was unfair and denied due process because the April 9 addendum was issued the day before the hearing; and that no substantial evidence supported the decision "to isolate vineyards for prohibition." None of these contentions has merit.

17

## 1. The Standard of Review

Under Code of Civil Procedure section 1094.5, the trial court reviews the commission's decision to determine whether the commission "proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [commission] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Id.,* subd. (b); *Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 921 (*Ross*).) "The [commission's] findings and actions are presumed to be supported by substantial evidence," and plaintiffs have the burden of demonstrating otherwise. (*Ross,* at p. 921.)

The trial court considers all relevant evidence, but does not substitute its own findings and inferences for those of the commission. (*Ross, supra,* 199 Cal.App.4th at pp. 921-922.) The trial court may reverse the commission's decision " 'only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by [the commission].' " (*Id.* at p. 922.) "Our scope of review is identical to that of the trial court. [Citations.] We, like the trial court, examine all relevant materials in the entire administrative record to determine whether the [commission's] decision is supported by substantial evidence." (*Ibid.*)

When interpreting a statute, our review is de novo, but the commission's interpretation of its governing statutes "is entitled to great weight." (*Ross, supra,* 199 Cal.App.4th at p. 922.)

## 2. Section 30512 versus Section 30514

Plaintiffs contend the commission was required to proceed under section 30512, rather than under section 30514 (governing

amendments).  As already noted, section 30512 requires the commission to determine, after a public hearing, whether the land use plan of a proposed local coastal program "raises no substantial issue as to conformity with" chapter 3 policies.  If the plan does raise a substantial issue, the commission must identify the issues and hold at least one public hearing on the matters identified.[6]

The commission, on the other hand, says that it properly proceeded under section 30514, which has no such requirement.  Under section 30514, "[a]ny proposed amendments to a certified local coastal program" must be submitted and processed under sections 30512 and 30513,[7] "except that the commission *shall make no determination* as to whether a proposed amendment raises a

---

[6]    Specifically, section 30512 requires the commission, after submission of the land use plan and after public hearing, to "either certify or refuse certification, in whole or in part," under specified procedures.  (*Id.,* subd. (a).)  The commission must determine, after the public hearing, "whether the land use plan, or a portion thereof applicable to an identifiable geographic area, raises no substantial issue as to conformity with the policies of Chapter 3."  (*Id.,* subd. (a)(1).)  If the commission determines no substantial issue is raised, the land use plan "shall be deemed certified as submitted." (*Ibid.*)  If the commission determines that one or more portions of a land use plan raise no substantial issue, the remainder of the land use plan "shall be deemed to raise one or more substantial issues," and the commission must identify each substantial issue for each geographic area.  (§ 30512, subd. (a)(2).)  The commission must hold at least one public hearing "on the matter or matters that have been identified as substantial issues."  (*Id.,* subd. (a)(3).)

[7]    Section 30513 describes the procedures that govern submission and approval of zoning ordinances and other implementing actions (the local implementation plan).

substantial issue as to conformity" with chapter 3 policies "as would otherwise be required by Section 30512." (§ 30514, subd. (b), italics added.) There is no limitation on the number of amendments included in a submittal. (*Ibid.*) And the scope of section 30514 is broad: "A certified local coastal program and all local implementing ordinances, regulations, and other actions may be amended . . . ." (§ 30514, subd. (a).)

The record shows the county identified its February 14, 2014 submission to the commission with a caption that begins with the words, "formal submittal of amendment to the 1986 land use plan." The submission included a "summary of the major differences between 1986 Malibu LCP, LUP and the current submittal." Similarly, the commission staff's March 27 report describing the county's proposed local coastal program stated that, "[f]or the Land Use Plan portion, the County is requesting an amendment to its existing certified Land Use Plan, consisting of a comprehensive update to replace the existing Land Use Plan with a new proposed Land Use Plan."

In the trial court, plaintiffs argued that section 30514 applies only when the local government is seeking "a minor change to its already-certified LCP." They relied on subdivision (e) of section 30514, which states that " 'amendment of a certified local coastal program' includes, but is not limited to, any action . . . that authorizes the use of a parcel of land other than a use that is designated in the certified local coastal program as a permitted use of the parcel." The trial court disagreed, pointing out that plaintiffs' argument was inconsistent with the plain language of section 30514, which specifies that an amendment "is not limited to" parcel use changes. (§ 30514, subd. (e).)

20

On appeal, plaintiffs take a different tack, telling us that section 30514 only applies to amendment of "[a] certified local coastal program" (§ 30514, subd. (a)), and in this case there was no certified local coastal program (only the 1986 certified land use plan).[8] We are not persuaded. A local coastal program does consist, as plaintiff observes, of both a land use plan and an implementation plan. But the only basis for rejection of an implementation plan is that it does not conform to or is inadequate to carry out a certified land use plan. (§ 30513, subd. (b).) The substance and prerequisite of a local coastal program is the certified land use plan; there cannot be any implementation plan without the land use plan. Plaintiffs' limited view of the scope of section 30514 as permitting amendment of a local coastal program but not a land use plan is not supported by a sensible construction of its words nor by any legal authority. To the extent legal authority exists, it is to the contrary. (Cf. *Yost, supra,* 36 Cal.3d at p. 573, fn. 9 ["A local government can amend a certified LCP [local coastal program] or LUP [land use plan] (§ 30514)."].)

Plaintiffs insist that when a land use plan entirely replaces an existing land use plan, it is not an amendment. The cases plaintiffs cite do not support that proposition. For example, plaintiffs tell us that the repeal and replacement of a statute "supersedes all prior statutes," rendering them "annulled, repealed

---

[8] The trial court observed that plaintiffs "do not argue that section 30514(b) applies only to amendments to a certified LCP, and the County only had a certified LUP at the time of the April 10, 2014 Commission hearing. In any event, the Commission's interpretation of section 30514(b)'s procedure as applying to an amendment to a certified LUP is entitled to deference."

21

and void."  For this rule, plaintiffs cite *Wood v. Roach* (1932) 125 Cal.App. 631, 638.  The aptness of plaintiffs' analogy is questionable, but in any event *Wood v. Roach* repeatedly refers to the enactments at issue, which established "a new and complete scheme," as the "amendments."  (*Id.* at pp. 636-638.)

In short, we see no basis in legal authority or sound reasoning for concluding that an amendment to a land use plan must do something less extensive than to replace the plan entirely. This is a circumstance where it is entirely appropriate to defer to the commission's interpretation of its own procedures.  (See *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 849 [" 'it is well established that great weight must be given to the administrative construction of those charged with the enforcement and interpretation of a statute.  [Citations.]  We will not depart from the Commission's interpretation unless it is clearly erroneous' "].)  We note as well that the commission has used the amendment process in analogous circumstances in the past. (Cf. *Headlands Reserve, LLC v. Center for Natural Lands Management* (C.D.Cal. 2007) 523 F.Supp.2d 1113, 1120-1121 [referring to the commission's certification of an amendment to a local coastal program where "[t]he new amendment replaced the pre-existing 1986 [local coastal program] and covered [a] previously uncertified . . . area"].)

In sum, the commission proceeded properly under section 30514, and therefore was not required to make the "substantial issue" determination otherwise required by section 30512.  (§ 30514, subd. (b).)

### 3. The "Blanket Determination" Issue: Agricultural Policies in Sections 30241 and 30242

Plaintiffs next argue the commission failed to proceed in the manner required by law because "it made a blanket determination that the Santa Monica Mountains are not suitable for agriculture." Plaintiffs say that sections 30241 and 30242 of the Coastal Act contemplate a determination of the feasibility of agriculture "in relation to a specific parcel of property," on "a case-by-case basis." We disagree. Plaintiffs misconstrue sections 30241 and 30242, mischaracterize what the commission did, and apparently misunderstand the point of a land use plan.

First, plaintiffs cite no authority for their "case-by-case basis" claim. As the commission points out, the whole point of a local coastal program is to allow local governments to do area-wide planning in conformity with the policies of the Coastal Act.

Second, sections 30241 and 30242 do not "contemplate" a case-by-case or parcel-by-parcel determination of the feasibility of agriculture. The commission properly considered these provisions, finding section 30241 does not apply, and appropriately protecting other lands suitable for agriculture as required by section 30242, as we now explain.

#### a. Section 30241

As we have said, section 30241 specifies that the "maximum amount of prime agricultural land shall be maintained in agricultural production."[9] The commission found this provision did not apply, because prime agricultural lands in the plan area were either public parkland, or were developed with existing uses and

---

[9] Section 30241 also specifies six ways in which conflicts between agricultural and urban land uses must be minimized. (§ 30241, subds. (a)-(f).) Such conflicts are not at issue here.

not in agricultural production. (The areas containing prime soils "represent less than 2 percent of the entire plan area," and the only areas in agricultural production "are very limited vineyard areas.") Plaintiffs have identified no basis for disagreement with the commission's conclusion (and completely misstate the basis for finding section 30241 inapplicable). As the trial court pointed out, the commission's finding that section 30241 did not apply was "supported by all the evidence in the record, not just substantial evidence."

### b. Section 30242

As we also said earlier, section 30242 states that "[a]ll other lands suitable for agricultural use shall not be converted to nonagricultural uses" unless "continued or renewed agricultural use is not feasible." (§ 30242.)

Plaintiffs contend it was "arbitrary and capricious" to find, as stated in the staff report, that a "confluence of factors— including steep slopes, poor soils, scenic considerations, sensitive watersheds, abundant [environmentally sensitive habitat areas], and lot size limitations—render the vast majority of the land in the Santa Monica Mountains unsuitable for agricultural use." Plaintiffs point to Mr. Hogrefe's testimony that the "vast majority of sites" contain good to excellent soil conditions for agricultural purposes, and that topographic conditions allow sustainable agricultural uses.

We see nothing arbitrary or capricious about the commission's conclusion.

First, there was ample evidence in the staff report that the plan area *is* generally unsuitable for agriculture. In addition to steep slopes and poor soils, water availability is limited, and the area contains significant biological and scenic resources.

24

"Activities such as vineyards or other intensive crop cultivation can have significant adverse impacts on the biological integrity of the surrounding mountain environment and receiving waterbodies."

Second, as the trial court pointed out, "[t]he mere possibility of successful agricultural use," as presented in the comments of plaintiffs' experts, is not sufficient. Plaintiffs did not show that land in the plan area is actually suitable or feasible for agricultural uses. The Coastal Act defines "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, *taking into account economic, environmental, social, and technological factors.*" (§ 30108, italics added.)

The staff report found that, in combination with the relatively steep topography, "vegetation removal, increased soil exposure, and chemical/fertilizer and irrigation requirements from crop-based agriculture can result in significant impacts to biological resources and water quality from increased erosion, sedimentation of streams, pollution, slope instability, and loss of habitat." And plaintiffs completely ignore the requirement for protection of environmentally sensitive habitat areas. (Recall that more than 87 percent of the 50,000 acres in the land use plan is designated either H1 or H2 (sensitive environmental resource areas), making those areas unsuitable for agriculture.) An assessment of "feasibility" requires consideration of these factors. Further, the Legislature recognized there would be conflicts between the policies of the Coastal Act, and declared that "such conflicts be resolved in a manner which on balance is the most protective of significant coastal resources." (§ 30007.5.)

Third, section 30242 protects against the conversion of lands to nonagricultural uses. This necessarily means, as the words of

25

the statute demonstrate, that the lands being protected either are now in agricultural use, or have been in agricultural use in the past.  The prohibition on conversion to nonagricultural uses does not apply where "*continued or renewed* agricultural use is not feasible."  (§ 30242, italics added.)  As the trial court put it, "[t]his plain language means that suitable lands that are feasible for 'continued or renewed agricultural use' cannot be used for another purpose.  It does not mean that all land suitable for agriculture must be used for agriculture."

Thus the trial court correctly gave no credence to testimony that the Santa Monica Mountains area has been zoned for agriculture "[f]or nearly 100 years."  The pertinent point was that "[t]here simply is no evidence that the [local coastal program] converts to a non-agricultural use any land that actually has been used for agricultur[e] anytime within the past 100 years."  The local coastal program approved by the commission fully protects areas currently in agricultural production, as dictated by section 30242.

There is no doubt that the preservation of agricultural land uses is an important public policy in California.  (§§ 10201, subd. (c), 31050, 31051.)  But so is the preservation of coastal resources, including environmentally sensitive habitat areas. (§ 30240, subd. (a) ["Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas."].)  We find no error in the commission's construction and application of the agricultural protections embodied in sections 30241 and 30242.

26

## 4.	The Fair Trial Issue

Our inquiry extends to "whether there was a fair trial." (Code Civ. Proc., § 1094.5, subd. (b).)  "[T]he 'fair trial' requirement is equivalent to a prescription that there be a fair administrative hearing."  (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1730.)

Plaintiffs contend the April 10 hearing was unfair and denied them due process because the commission "gave less than 24-hours' notice of a new [land use plan] that would completely ban vineyards."  Plaintiffs are referring to the staff's April 9 addendum, which responded to the public comments on the staff's March 27 report.  The staff responded by proposing modifications to the land use plan that would allow new agriculture (but not vineyards), subject to slope and "organic or biodynamic farming" requirements.

To be clear, the April 9 addendum was not a "new" land use plan, nor did it propose a new treatment of vineyards.  The addendum was issued in response to public comments, including those of plaintiffs, and it addressed their arguments opposing the agriculture ban by allowing some new agriculture, subject to significant restrictions.  The addendum was issued the day before the public hearing, and complied with the pertinent regulations, as did the March 27 report.  That is the way the process is supposed to work.  Specifically:

Several regulations govern commission action on land use plans.  (Cal. Code Regs., tit. 14, §§ 13530-13541.)  As pertinent here, section 13532 of the regulations governs the staff recommendation.  It requires the executive director to prepare the recommendation, which must set forth specific findings, including facts, legal conclusions, suggested modifications, and so on.  "In

27

order to assure adequate notification," the regulation specifies the distribution of "the final staff recommendation" to interested persons and organizations, "within a reasonable time but in no event less than 7 calendar days prior to the scheduled public hearing." As the trial court pointed out, the March 27 report was the "final staff recommendation" meeting the criteria in section 13532 of the regulations.

The succeeding section of the regulations (§ 13533) provides for comments from the public and others on the staff recommendation. (Cal. Code Regs., tit. 14, § 13533, subd. (a).) Notably, section 13533, subdivision (b) states: "The staff shall respond to significant environmental points raised during evaluation of the [local coastal program]. The response may be included within the staff report and shall be distributed to the Commission and the person making the comment. The response shall be available at the hearing on the [local coastal program] for all persons in attendance."

The April 9 addendum was the staff's response to the comments received concerning the agricultural ban, taking them into account and recommending the modified policy described above. As the trial court found, the staff response and recommendation "met the requirements of 14 CCR section 13533, which only requires that it be 'available at the hearing on the [local coastal program] for all persons in attendance.' "

Plaintiffs assert the commission's compliance with the regulations "is of no moment," citing a case that states an affected person "might well be able, in the circumstances of a given case," to demonstrate a denial of procedural due process notwithstanding full compliance with all applicable regulations. (*Laupheimer v. State of California* (1988) 200 Cal.App.3d 440, 456, 449 [rejecting

28

claim that a statute and rules (on forest resources) as written denied procedural due process].)  Plaintiffs have made no such demonstration, nor could they in the circumstances of this case. (Cf. *Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1072 [due process " ' "varies according to specific factual contexts" ' "; in some cases, " ' "due process may require only that the administrative agency comply with the statutory limitations on its authority" ' "].)

Instead, all plaintiffs do is insist that the April 9 addendum "significantly altered the fundamental premise" of the land use plan and was a "complete change in position without any advance knowledge" that "flies in the face of due process 'dignity' and fairness."  Plaintiffs' rhetoric does not comport with the facts or the law.

Nothing about the proposed modifications—responsive to public comment on the plan—altered the plan's original objective: "Agricultural uses are proposed for restriction in the proposed [local coastal plan]."  The modification merely eased, to a very limited extent, the categorical restriction on new agriculture. To call this a "complete change in position" is simply wrong.

Plaintiffs repeatedly protest that they had no time to refute the "special, distinct prohibition of all new vineyards."  But the prohibition on new vineyards never changed, and plaintiffs present no rational explanation of their assertion that the "complete and singular vineyard ban" would generate a significantly different response from the original ban on "[n]ew crop, orchard, vineyard, and other crop-based non-livestock agricultural uses."  Moreover, plaintiffs in fact responded to the "new" ban on vineyards in the April 9 addendum, both in writing (by letter and with the submission of two research reports), and at the hearing.

29

In addition, there is precedent for the issuance of a staff addendum under similar circumstances. In *Ross,* the court rejected a claim that availability of a staff report 13 days before the hearing was unreasonable, observing it was nearly twice the period (seven days) required by the regulations. (*Ross, supra,* 199 Cal.App.4th at p. 939.) As relevant here, an addendum to the staff report was issued two days before the hearing. The court held the addendum was "not subject to the notice requirement under Code of Regulations, title 14, section 13532." (*Ibid.*) The court observed that, "[i]n the addendum, the commission responded to public comments; recommended modification of the view corridors in response to public comments; and discussed additional biological information specific to the subject property's proposed subdivision." (*Ibid.*) The same is true here: the staff responded to public comments with a modification of the ban on new agriculture.

Plaintiffs argue *Ross* does not apply because the addendum in that case "made minor changes to the prior commission staff report" (*Ross, supra,* 199 Cal.App.4th at p. 915), and did not involve a proposed new local coastal plan, but rather was directed primarily at a particular beach-front property. These are distinctions that make no difference. *Ross* did not base its analysis on a minor-versus-major basis. Nor do we consider the continued ban on vineyards to be a major change.

Further, we note that the commission's regulations permit a local government to amend its land use plan "prior to the commencement of the vote" on the plan as submitted, and the commission then determines whether or not the amendment "is material and includes changes that have not been the subject of public review and comment before the Commission." (Cal. Code

Regs., tit. 14, § 13536.) If the amendments are minor, or if they are material but have been the subject of adequate public comment at the public hearing, the commission is to consider the amendment and act on the plan as amended rather than as initially submitted. (*Ibid.*) That is analogous to the circumstances here. Plaintiffs have not demonstrated either the materiality of the changes made in the April 9 addendum or that they were not the subject of adequate public comment at the hearing.

Plaintiffs' final argument on its due process claim is that the trial court erred in refusing to augment the record with documents relating to the federal designation of the Santa Monica Mountains coastal region as an American Viticultural Area. But plaintiffs did not even seek augmentation of the record until after the September 5, 2017 hearing on the merits of their writ petition. At that hearing, the court resolved all other issues, and the vineyard ban was briefed and argued. The court requested supplemental briefing, solely on whether the ban on vineyards was supported by substantial evidence. Plaintiffs did not request augmentation until a month later, contemporaneously with filing their supplemental brief.

The court denied the motion as unauthorized and untimely. The court stated that plaintiffs "did not ask, and the court did not authorize, a motion to augment the record," and plaintiffs provided "no excuse for their failure to bring this motion at the original writ hearing." The court further stated that the documents could have been obtained in time for the commission hearing had plaintiffs exercised reasonable diligence. Indeed, plaintiffs "admit that many of the documents they seek to add to the Administrative Record existed at the time of the Commission's April 10, 2014 hearing."

Plaintiffs do not explain why the court's ruling was an abuse of discretion, and of course it was not. They simply assert—again—that they were "misled" and could have produced more evidence to challenge the vineyard ban if more than 24 hours' notice had been given, and thus they "were prejudiced by the denial of due process." As we have seen, there was no failure of due process. There was likewise no error in the court's denial of plaintiffs' motion to augment the record.

**5.    The Substantial Evidence Issue**

Plaintiffs contend, in essence, there is no evidence vineyards are any worse than other crops that are not subject to a total ban: They contend "there was no substantial evidence that vineyards were deserving of isolation or distinction as being uniquely disruptive of watersheds, erosion, [environmentally sensitive habitat areas], scenic views or of any other coastal resource." Our review of the record, like the trial court's, leads to a contrary conclusion.

There are, in particular, two pieces of evidence—the UCLA study (mentioned in the fact section) and expert testimony from Dr. Jonna Engel, the commission's staff ecologist—that directly support the commission's conclusion that vineyards pose a threat to coastal resources and therefore should be banned.[10] The evidence plaintiffs cite, on the other hand, while it supports the suitability of lands in the Santa Monica Mountains for vineyards,

---

[10]    There was other evidence as well, including letters and statements from various groups and public officials, that supported the vineyard ban. The trial court found these documents were "not particularly persuasive" because there was no discussion of the evidence underlying their conclusions, so they were "not sufficient on their own to constitute substantial evidence."

does nothing to counter the evidence of environmental harm caused by vineyards. As the trial court pointed out, it is feasibility, not suitability of the land, that is critical, and feasibility as defined in the Coastal Act requires the consideration of environmental factors.

## The UCLA study

The UCLA study sought to identify areas where vineyard development could potentially occur, and to identify existing vineyards in the area. Plaintiffs cited the study to the trial court as "directly on point" and characterized it as "an unbiased report." They emphasized its finding that 62.5 percent of the land in the Santa Monica Mountains is favorable for vineyard development.

Remarkably, however, plaintiffs completely ignored the substance of the report. (They do not refer to it at all in their appellate briefing.) The abstract of the study begins with the observation that, despite conservation efforts, urbanization "has already contributed to widespread disturbance throughout the [Santa Monica Mountains National Recreation Area (SMMNRA)], and recent trends in the development of vineyards could pose further threats. Additional vineyard development has the potential to severely disturb natural areas, which could result in fragmentation and loss of native species."

The abstract of the study summarizes: "Analysis indicated that unprotected areas in the SMMNRA are at risk of being disturbed by vineyard development. Of the 48,394 acres in the study site, 62.5% had favorable physical conditions and appropriate zoning for development. A land cover analysis underscored the potential effects of widespread development *as 74.5% of native vegetation in the study site was at risk.*" (Italics added.)

33

The report explained in its introduction that an increasing number of private landowners were beginning to explore opportunities for developing hobby vineyards, and "[w]e attempted to identify potential areas for vineyard development in order to distinguish habitats at risk of disturbance and improve land use policy." The report identified "vegetation types that were at high risk of being displaced or disturbed by development." The study explained that "[t]he extent of maximum development and displaced vegetation are important due to the adverse effects that vineyard development may have on an ecosystem." The authors cited other studies showing that "[d]isplacement of natural vegetation is a direct cause of habitat loss and is disruptive to ecosystem health," and that "[d]evelopment effects include fragmentation and increased edge effects[,] decreases in habitat size and complexity, changes in predominant vegetation types, effects on local hydrology, water pollution, soil erosion, and air pollution [citations]."

### Dr. Engel's rebuttal statement

Testimony at the April 10 hearing likewise supported the ban on vineyards. Dr. Engel testified that vineyards present "numerous significant adverse impacts upon the native Mediterranean habitats" in the Santa Monica Mountains, including habitat loss, habitat fragmentation, disruption of wildlife corridors, and a significant reduction of biodiversity. "From myriad species of plants and animals, to a near monoculture of non-native species, peer reviewed research has demonstrated that the insect community associated with vineyards tends to support more non-native species, and that the modified insect community spills over to the adjacent native habitats."

34

Further, "[d]ue to the inherent biology of grapevines, vineyards in particular introduce significant negative changes to the soil chemistry from the perspective of Mediterranean plant communities." Dr. Engel also testified that, while vineyards in general "may not require much fertilization, they typically require pesticides and fungicides, which are introduced into the surrounding native habitats, including the creeks and streams, and watersheds with vineyards." Other points in her testimony are reproduced in the next footnote.[11]

Dr. Engel concluded by citing a recent paper in the proceedings of the National Academy of Sciences, in which the author stated: " 'Vineyards have long lasting effects on habitat quality, and may significantly impact fresh water resources. In addition to introducing sterilizing chemicals and fertilizer, which remake the ecosystem, mature vineyards have low habitat value

---

[11] Dr. Engel countered testimony from Mr. Schmitz of the California Coalition of Coastal Farmers that vineyards increase soil fertility through nitrogen fixation and mineral depositing. She agreed, but observed "[t]his is not a positive for Santa Monica Mountains plant communities that are adapted to porous, nutrient poor acidic soil. More nutrient rich soils, such as those created by vineyards, also tend to facilitate the invasion of non-native species." Dr. Engel also responded to Mr. Schmitz's testimony that wine grapes have deep roots that may serve to stabilize slopes. "While grapevines may have deep roots, the native woodland, coastal sage scrub and chaparral communities have plant species that exhibit root stratification. That is plants with shallow roots, moderately deep roots, and deep roots. This pattern of root distribution naturally provides great soil stability. It is also thought that this is an adaptation of these species to limited water resources."

for native species, and are visited more often by non-native species."

As noted above, plaintiffs do not address the evidence in the UCLA study, and they refer to Dr. Engel's testimony only to challenge her statement that vineyards "typically require pesticides and fungicides," and to wrongly characterize her testimony as "inherently untrustworthy." Instead, plaintiffs contend the evidence "that was specifically related to vineyards" was "undisputed that vineyards were ideally suited for the Santa Monica Mountains," as vineyards require much less water and thrive on steep slopes and in poor soils. That evidence misses the point: As the trial court observed, "suitability does not make vineyard development feasible," because feasibility requires an evaluation of environmental, social, and economic factors. (§ 30108.) And there is no evidence in the record that counters the evidence that vineyards are harmful to the ecosystem and coastal resources in the Santa Monica Mountains.[12]

In short, we are in complete agreement with the trial court's summary of the substantial evidence in the record: "[V]ineyards are harmful to the Santa Monica Mountains ecology because they require clearing and scarification, increase erosion and sedimentation, require pesticide use, and constitute an invasive monoculture. Of these harms, many are inherent in the nature of viticulture, and there is no evidence they could be mitigated.

---

[12] The evidence with which plaintiffs sought to augment the record would not help. As the trial court pointed out, the federal "American Viticultural Area" designation "makes no findings about the environmental harms caused by vineyards or the appropriateness of their use," and "does not counter [the] Commission's evidence that viticulture is harmful to the ecosystem and coastal resources of the Santa Monica Mountains."

Vineyards increase erosion because the hillsides are planted with grapes where the hillsides are bare during winter months and lack the root stratification of native vegetation. . . . They create air pollution from dust. Grapevines are an invasive monoculture species that impact all of the surrounding vegetation and harm riparian habitat. . . . They create water runoff and sedimentation of streams. The only impacts that could be mitigated [are] the use of pesticides, which is already banned under the [local coastal plan], and water usage. Under these circumstances, substantial evidence supports the Commission's decision to ban new vineyards."

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.


GRIMES, Acting P. J.


WE CONCUR:


STRATTON, J.


WILEY, J.